# Court of Appeals.

## March 27, 1900.

## PEOPLE v. FRITZ MEYER.

1. CONSTITUTIONAL LAW—JURY.

On trial for homicide in the city of New York, the fact that the jury was drawn from a panel which did not include the names of the jurors selected by the special commissioner of jurors under chapter 378 of the Laws of 1896, was not an invasion of defendant's constitutional rights.

2. CRIMINAL LAW—CONFESSIONS.

It is the right and duty of the court to admit evidence of confessions when it clearly appears that it was purely voluntary and entirely free from vices which furnish the ground for exclusion. It is, manifestly, the better rule to resolve in favor of a defendant all doubts as to the character of confessions attributed to him by the submission to the jury of all disputed questions relating to the competency of such statements.

3. SAME—TECHNICAL ERROR.

Where there is abundant evidence, outside of the confessions, to establish the defendant's guilt, the rulings of the court upon these confessions were not material, and did not prejudice the defendant's substantial rights, and it is the duty of the court of appeals, therefore, in the promotion of justice, to disregard the same.

4. INDICTMENT—STATUTE.

A common law indictment "stating the facts constituting the crime, and charging the killing to have been willfully, feloniously and with malice aforethought, is sufficient to sustain a conviction of murder in the first degree, if the proof as to the manner of the commission of the crime brings its within one of the statutory definitions."

APPEAL from a judgment of the supreme court of the county of New York, upon a verdict convicting the defendant of the crime of murder in the first degree.

S. J. O'Hara, for appellant.

Charles E. LeBarbier, for respondent.

WERNER, J.—At a term of the supreme court, held in and for the county of New York, on the 23d day of November, 1897, the defendant was convicted of the crime of murder in the first degree for the killing of one Frederick Smith, a police

officer in the city of New York. The evidence which consti-
tutes the case of the people discloses the following facts:

The Church of the Most Holy Redeemer is situate on East
Third street and Avenue A, in New York city. At the rear
or Fourth street end of the church is the parochial school,
which is so constructed and connected with the church building
as to form a part thereof. Fronting on Third street is the rec-
tory or priest's house, which is connected with the church by
means of a hallway or corridor, and doors leading from the same
into the church and rectory respectively. In the church near
the Third street entrances thereof, there were located four
"poor boxes" or receptacles for the alms of those attending the
services. Each of these boxes was connected by an electrical
appliance with a bell or "burglar alarm" placed in a room in
the rectory. On the night of the 26th of October, 1897, about
ten minutes before midnight, this burglar alarm sounded and
aroused Conrad Kirchhaff, otherwise known as "Brother Wil-
liam," who occupied that room on that night. He hastily
dressed himself, and, going out upon the street, gave an alarm
which was responded to by police officer Frederick Smith.

These two were immediately joined by police officer William
N. Conklin and one Otto Dengler, a citizen residing opposite
the church. They proceeded into the rectory, where they pro-
cured lights, and from thence into the church. An examina-
tion of the "poor boxes" disclosed that the first three were in-
tact, but the fourth one, from which the alarm had proceeded,
was found broken open, the door thereof lying upon the floor.
Search was then made of the church. After going the whole
length of the church, in separate aisles, the party came together
at the altar, and at this juncture Officer Smith discovered that
the door leading from the church into an alleyway which com-
municated with the schoolroom was open. He disappeared
through that door, lantern in hand, and in about two minutes
two distinct shots were heard from the direction of the school-
room. Officer Conklin and "Brother William" at once entered
the schoolroom and saw a human form retreating "head first"
through the upper half of a door leading to Fourth street.
Upon looking about the schoolroom they saw Officer Smith ly-

ing across two school desks, with his face downward, breathing heavily and bleeding. Officer Conklin ran to the door, the upper or glass part of which had been broken by the person who had jumped through the same, and shouted to some persons who had been attracted by the crashing of glass, "Stop that man." Thereupon Max Schmidt and Charles Veitze, two bystanders, seized the man, who was positively identified by Officer Conklin as the man whom he saw going through the window, and quite as positively identified by Schmidt and Veitze as being the defendant. Schmidt saw something in defendant's hip pocket which "glittered," and upon taking it out it proved to be a revolver. At the same time one Frank Henrich, another bystander, who saw the man coming out of the window, and identified the defendant as that man, pulled out of defendant's hand a long, round package, which resembled in form and weight an instrument which was afterwards called a "jimmy." This instrument was given by Henrich to one Endres, who describes it as a "chisel." The latter gave it to one Imsen, and he in turn gave it to a police officer. The revolver taken from the defendant by Schmidt was handed to Officer Conklin, who turned it over to Police Sergeant Diamond. The latter testified that it was a six chamber revolver, and when it was delivered to him two chambers were empty and four were loaded. Other witnesses described it as a thirty-two calibre revolver. After turning defendant over to Officer Ryan, Officer Conklin sent in a call for an ambulance. This was responded to at once. Upon arriving at the church the surgeon in charge of the ambulance found Officer Smith in a moribund condition, and within a few minutes he died. Such further facts as are material will be discussed in connection with the questions raised by this appeal.

After his arraignment, and before a jury was impaneled, the defendant interposed a challenge to the panel of jurors summoned for the term at which his case was tried. The grounds of challenge were: (1) "That the panel of jurors summoned for the trial of criminal causes in this court for the term commencing November 1, 1897, has been improperly, illegally, and in contravention of defendant's constitutional right, drawn from

an improper and illegal and insufficient list of trial jurors, for the trial of causes in the city and county of New York, especially in that from such list of trial jurors, and in the drawing and summoning of this panel therefrom, there were illegally, improperly and in contravention of defendant's constitutional right, excluded therefrom, and not included or embraced therein, all persons selected by the special commissioner of jurors in and for the city and county of New York, appointed by the appellate division of the supreme court for the first department pursuant to chapter 378 of the Laws of 1896, entitled ' An act providing for a special jury in criminal cases,' etc., and (2) That upwards of two thousand five hundred persons qualified to serve as trial jurors in said city and county have been excluded from such lists of trial jurors, from which said panels were drawn and summoned, and have been placed upon a list of special jurors for the trial of criminal causes, pursuant to said act, and have been improperly and illegally exempted from service upon general and ordinary duty as trial jurors under the provisions of said act, to the injury of defendant's substantial rights."

When the twelfth juror was called the defendant had exhausted the peremptory challenges to which he was entitled. After unsuccessfully challenging this juror upon various grounds, the defendant interposed the same challenge that he had previously offered to the panel. The exceptions taken to adverse rulings upon these challenges present the first question we are called upon to consider.

This precise question was before this court in People v. Dunn, 157 N. Y. 528. In a very clear and able opinion Judge Gray disposes of the fallacy that mere regulations of the methods by which jurors are drawn are invasions of constitutional rights. It is true in the Dunn case the question was examined from the opposite point of view. But the principle underlying the whole question is the same   There the defendant complained because he was compelled to take his jury from those selected by the special commissioner of jurors, instead of being permitted to select them from the general panel. Here the defendant objects because he is driven to a choice from the gene-

ral panel after the special commissioner of jurors has taken therefrom two thousand five hundred men of presumably superior intelligence. In either event the result is the same so long as it does not infringe upon the right of a party to such a trial by jury as the Constitution guarantees. And what does the Constitution guarantee? Simply the right to a trial by a common law jury of twelve men. Wynehamer v. People, 13 N. Y. 378–458. Such a jury is none the less a common-law jury because the legislature happens to have provided for the particular mode of selection. This has always been regarded as a mere legislative regulation. The whole matter may be summarized in the simple inquiry whether the defendant had such a jury as he would have been entitled to if no special jury law had ever been enacted. The answer is obvious, and in view of the elaborate discussion of this question in the Dunn case, we deem it unnecessary to pursue it further.

Upon the trial evidence was given of confessions alleged to have been made by the defendant to the witnesses Dengler, Herlihy and others. This evidence was objected to on the grounds that such confessions, if made, were not voluntary, but were made under duress and under the influence of fear produced by threats, while the defendant was in actual custody and after he had been subjected to brutality at the hands of the police. To this objection the court interposed the suggestion that there was no evidence that the defendant had been subjected to brutality at the hands of the police, or that the defendant's statements had been made under fear produced by threats, or were not voluntary. The court thereupon overruled defendant's objection, but gave him the opportunity to cross-examine the witnesses as to the circumstances under which defendant made the alleged confessions. Defendant's counsel thereupon examined the witnesses by whose testimony the prosecution offered to prove said confessions. At the conclusion of these preliminary cross-examinations the witnesses were permitted to testify to the statements made by the defendant concerning the homicide. To this defendant objected on the ground that it appeared that such statements were not voluntarily made, but were made under the influence of fear produced

by threats. The court ruled that the evidence elicited on de-
fendant's preliminary cross examinations was not sufficient to
present a question as to whether said confessions were volun-
tarily made or not, and overruled defendant's objections. The
same questions arose at different stages of the trial, both upon
the exceptions taken to the admission of this kind of evidence
and to the refusal of the court to charge that the question
whether said confessions were voluntary or otherwise was for
the jury.

This feature of the case cannot be intelligently criticised with-
out a recital of the evidence out of which it arises. It appears
that immediately after the defendant's arrest he was taken to
a police station on Fifth street. The uncontradicted testimony
is to the effect that when the defendant arrived there he exhib-
ited no marks of violence or rough treatment. After a short
stay at the station house the defendant was taken back to the
church to be identified by Smith. As he was brought out of
the church to be returned to the police station, he was, accord-
ing to the testimony of police officer Ryan, beset by citizens
who had gathered on the street and beaten with sticks and canes.
When he reached the station the second time he was bruised
and bleeding about the head, and was cared for by the am-
bulance surgeon who was in attendance. This testimony coin-
cides with that of the other witnesses who saw the defendant at
the station-house on that night. In the forenoon of the same
day the defendant was taken before a police magistrate, who,
after some conversation with Police Captain Herlihy, in the
presence of the defendant, remanded the latter to await the ac-
tion of the coroner. There is some confusion in the evidence
as to the time when the defendant was taken before the coro-
ner. Captain Herlihy stated that it was on that same day. The
witness Dengler thought it was on the next day. Captain Her-
lihy testified that when the defendant was brought back to the
station-house the second time he interrogated him as follows :
" I asked him his name; he said it was Fritz Meyer; his age
forty-five; born in Germany; occupation a laborer, and no
home. I asked him then what he was doing in that church; he
said he went in there for the purpose of robbing it. I asked

him how he entered it; he said he went in when services were going on about seven P. M.; I asked him what he done then; after services were over he hid himself in the church. I asked him what for, and he said for the purpose of robbing it; I asked him then why he shot the police officer; he stated, 'I shot him because I did not want him to take me;' that was his exact language; I says, 'How many shots did you fire at the police officer?' He stated two; showing him a revolver which had been taken from him, and asking him if it was his revolver; he stated, 'yes.' I asked him if that was the revolver he shot the police officer with; he stated yes; showed him this instrument, which had been taken from him, and asked him if it was his property; he stated yes; I asked him what he used that for; he stated for breaking and opening doors."

The witness Dengler testified that while waiting with the defendant and others, in the anteroom to the coroner's office, the defendant was asked, "do you know this man?" meaning me; says he "No;" says I, "Haven't you seen me the night that you were in the church?" "No;" says I, "How did you get into that church and when?" says he, "During services about seven o'clock in the evening;" said I, "Where did you go?" Says he, "I sat in the last row of benches, and when I got a chance I went up in the gallery and hid myself; when the clock of the Third street church struck a quarter to twelve I went down;" and he said he went to that poor box, the one nearest to Avenue A—the one found broken open—then says I, "When did you know that you were discovered?" Says he, "I heard the iron bolts between the rectory and the church; I heard them pulled back and voices; and he says it was then and there that he ran back into that room—into the schoolhouse; he unbolted one door; he ran down on the Avenue A aisle, he told me, and opened that door between the church and the schoolhouse; there is a door there that leads from the church right by the end of the altar; the door is facing the altar on the east side—on the northeast corner of the church facing the altar; the door is facing the altar on the east side; he says he went through that alleyway and then into the schoolroom, and thought he could hide himself in there; he said he heard some-

body coming in through the alleyway into the schoolhouse; he told me that he went to the end of the schoolroom, and told me that he went down both stairways there — one leading to the Fourth street entrance and the other, as I have since been told, to the boiler room; he said he went down both stairways and found that he could not get out, and he said: "As I came up the stairway the officer stood at the head of the stairway," and he said the officer asked him what he was doing there, and he said, "with that I shot him; " so then I asked him, says I, "I was looking through all the confession boxes on the side of the church; " I said, "had you been in one of them as I opened the door, would you have shot me?" says he, "Yes;" I asked him then how he got out through the church, and he told me he jumped through that window; the door that he went through— that he broke; the schoolhouse that led through on to Fourth street; when I asked him if he would have shot me, he said, "I would have shot the first man that came in front of me to get away."

Police Sergeant Diamond was present when the defendant was interrogated by Captain Herlihy, and corroborates in detail the latter's testimony as to the statements made by the defendant.

George W. Arnold, a newspaper man connected with the New York *Journal*, testified to an interview with the defendant at the Tombs prison a day or two after the homicide. His version of that interview is as follows: "I asked him why he shot Policeman Smith, and he said he simply took a chance—a chance that every man had to take in his life; that he would, under the same circumstances, take the same chance again; that it offered him one opportunity, with the chance of all the kind of things that that implied, and he took it."

Robert Wilkes, another newspaper reporter, testified to an interview with the defendant at the Tombs on the day when the indictment was found against the defendant. The witness stated to the defendant that there was a "chance of him beating the game." The defendant replied: "What is the use; I have killed a man, and the police have got me, and that is all there is to it, no power on earth can save me."

It will be observed that the evidence of the foregoing statements, alleged to have been made by the defendant, was most cogent, and if regarded as trustworthy and credible, and considered in connection with the other evidence in the case, was absolutely conclusive, not only as to defendant's guilt, but as to the degree of the crime which he had committed.

It becomes our duty, therefore, to determine if there was error in the reception of this evidence, or, if it was properly received, whether the trial court erred in assuming to decide as matter of law that the confessions attributed to the defendant were voluntarily and freely made by him. As to the first branch of this inquiry there can be no doubt. Section 395 of the Code of Criminal Procedure is an explicit statutory declaration of the rule which has been adhered to by this court ever since the decision in Hendrickson v. People, 10 N. Y. 13. The following cases are examples of the application of this rule: People v. Wentz, 37 N. Y. 303; Teachout v. People, 41 id. 7; Murphy v. People, 63 id. 540; Cox v. People, 80 id. 500; People v. McGloin, 91 id. 241; People v. Chapleau, 121 id. 266; People v. Wright, 136 id. 625; People v. Cassidy, 133 id. 612, and People v. Kennedy, 159 id. 357.

The rule which makes the confessions of a defendant competent evidence against him is, however, guarded by several limitations which materially affect the competency and the scope of such evidence. The confessions sought to be proved must not have been "made under the influence of fear produced by threats," nor pursuant to a stipulation of the district attorney that the person making them "shall not be prosecuted therefor." Neither shall any such confession be sufficient to warrant a conviction without additional proof that the crime charged has been committed. § 395, Code Crim. Proc. That portion of the section which affects the competency of such evidence imposes upon the trial court the duty of deciding when it is admissible. It would not be difficult to imagine a case in which the inadmissibility of such evidence would be so palpable as to preclude doubt or discussion. What, then, is the duty of the court in a case where there is absolutely no doubt as to the admissibility of such evidence? Must that be submitted to a

jury as a question of fact which is plainly a naked question of law? We think not. The right and duty of the court to ex-clude such evidence when it is the product of fear, duress or threats, presupposes the same right and duty to admit such evidence when it as clearly appears that it was purely voluntary and entirely free from the vices which furnish the ground for exclusion.

We do not decide that the competency of such testimony always presents a question of law for the decision of the court, on the contrary, it may be, and frequently is, a question of fact to be decided by the jury under proper instructions of the court. People v. Cassidy, 133 N. Y. 612, was such a case.

The question then arises whether this is a case in which it was proper for the court to decide, as matter of law, that the confessions made by the defendant was voluntarily given. There is nothing in the evidence except the defendant's arrest and the fact that he was subjected to some physical violence at the hands of the bystanders when he was being conveyed to the police station that would furnish even a pretext for the claim that defendant's confessions were not voluntarily made. The language of the statute is that such confessions " can be given in evidence  *   *   *   unless made under the influence of fear produced by threats." There is not a suggestion of fear or threat even as to the confession alleged to have been made by defendant to Captain Herlihy within an hour of the arrest. But, whatever view may be taken of this particular confession, it is clear to a demonstration that the statements made by the defendant to Dengler, to Arnold and to Wilkes were purely voluntary. The statement to Dengler was made on the day after the homicide in the anteroom of the coroner's office. Dengler was not an officer of the law, and was not even known to the defendant until the latter was told of the former's parti-cipation in the search of the church premises after the alarm had been given. This statement bears intrinsic evidence of having been voluntarily made. There was no occasion for making it at all, except the volition of the defendant. The same thing is true of the statements made to the reporters Arnold and Wilkes. The defendant was in custody, but that of itself does not raise a

question as to the competency of his statements as evidence against him. The court instructed the jury that they were not concluded by these confessions, and that the credibility of the witnesses who testified to them must be passed upon by the jury. After a most diligent and careful study of the record, so far as it relates to the question now under discussion, we are of the opinion that the trial court committed no error in deciding as a matter of law that the confessions of the defendant were voluntarily made. This decision is made, however, purely upon the facts of this case, and is not designed to formulate a rule for the guidance of trial courts in other cases. It is, manifestly, the better rule to resolve in favor of a defendant all doubts as to the character of confessions attributed to him by the submission to the jury of all disputed questions relating to the competency of such statements.

There is, however, another aspect to this case which, of itself, would justify the affirmance of the judgment herein. There was ample evidence, outside of defendant's confessions, to sustain the verdict of the jury. These confessions, if accepted as true, of course removed all doubt as to the motive and purpose which actuated the defendant in the firing of the shots that caused Smith's death. They were offered for the sole purpose of proving the existence of deliberation and premeditation as essential ingredients of the crime of murder in the first degree as defined in one portion of section 183, Penal Code.

Here, however, there was abundant evidence, both direct and circumstantial, outside of defendant's confessions, to prove his guilt of the crime of murder in the first degree, under that provision of the statute which declares that the killing of a human being is murder in the first degree when done " without a design to effect death, by a person engaged in the commission of, or in an attempt to commit, a felony, either upon or affecting the person killed or otherwise." Sec. 183, Penal Code.

Burglary in the third degree is a felony. That part of section 498 of the Penal Code which is applicable to this case defines burglary in the third degree as follows: " A person who * * * being in any building, commits a crime therein and

breaks out of the same, is guilty of burglary in the third degree." The evidence was ample to warrant the conclusion that the defendant was in this church for the purpose of committing larceny. Larceny of any degree is a crime, and the attempt to commit larceny in any degree is a crime. Secs. 528 and 34, Penal Code. The evidence establishes beyond a reasonable doubt that the defendant fired the shots which caused the death of Smith; and conclusively that death resulted from the wound inflicted by such shots. The evidence is equally incontrovertible and uncontroverted that the defendant did " break out " of the building in which he had committed a crime. Thus, all the constituent elements of the crime of one kind of murder in the first degree were proven, and under these circumstances the judgment of the court below would be upheld, even though it were assumed that a technical error had been committed in withholding from the consideration of the jury the question whether defendant's confessions were voluntary or not. Under the circumstances of this case, the rulings of the court upon these confessions were not material, and did not prejudice the defendant's substantial rights. It is the duty of the court, therefore, in the promotion of justice, to disregard the same. Sec. 542, Code Crim. Proc.

But the appellant insists that the indictment was insufficient in form to give competency to the evidence of the commission of a felony as an incident to the killing. This question was set at rest in People v. Giblin, 115 N. Y. 196, where it was held that a common-law indictment " stating the facts constituting the crime, and charging the killing to have been done willfully, feloniously and with malice aforethought, is sufficient to sustain a conviction of murder in the first degree, if the proof as to the manner of the commission of the crime brings it within one of the statutory definitions." ·

In that case, as in this, the indictment was in the old common-law form, and the proof showed that the defendant had done the killing while in the commission of a felony, which brought the crime within one of the statutory definitions of murder in the first degree. There are other exceptions in the case which we have not discussed, not alone because we do not

deem them worthy of consideration, but because appellant's counsel suggested that the court limit its discussion to the exceptions above referred to.

We may, therefore, conclude the performance of our solemn duty in this case by stating that we find no error in the rulings and decisions of the trial court, which require or permits a reversal of its judgment, and the said judgment should, therefore, be affirmed.

PARKER, Ch. J., GRAY, O'BRIEN, HAIGHT and CULLEN, JJ., concur; LANDON, J., concurs in result.

Judgment of conviction affirmed.