## Court of Appeals.

June 5, 1900.

## PEOPLE v. JOHN ZIGOURAS.

(163 N. Y. 250.)

MURDER—CHARGE—CONSIDERATION OF THREATS MADE BY DECEASED.

In a capital case the court refused to charge the jury " That they may consider in determining as to whether the defendant had reasonable grounds for believing that he was in imminent danger of death or great personal injury from the deceased, that the deceased, prior to the shooting, had made threats to the defendant that he would kill or injure him," saying, " Refused; because the basis for making it is not borne out by the evidence." *Held* error, as to hold there was no basis in the evidence for such a request might have been understood as holding that defendant's testimony was not true.

PARKER, Ch. J., dissenting.

APPEAL from a judgment of the court of general sessions of the peace of the city and county of New York, entered May 26, 1899, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

LANDON, J.—The defendant, a Greek, a maker of flowers, on the 18th day of February, 1899, in the kitchen where he at the time was serving his employers, Nicholas and Minaky, as cook, on Fifteenth street in the city of New York, in the presence of a Frenchman named De Varney, fired four pistol shots into the body of another Greek named Ferantos, also a maker of flowers, and killed him. This is not denied. The defendant and his counsel admit it. De Varney was a music teacher, disabled at the time by a broken arm. He and Ferantos roomed together on Thirteenth street. He did not understand Greek. He testified that about twenty minutes before the shooting took place Ferantos and himself having that forenoon already made some calls in a social way at places where one or the other was familiar, at the suggestion of Ferantos called upon the defendant; that the defendant greeted Ferantos and talked with him in Greek, but did not speak to the witness; that after about five minutes the defendant placed a plate containing a stew upon the table, gave each one of them a fork and invited them to eat. This they did, each sitting upon a separate small bench. Another Greek named Floris came in, and the defendant served him with a stew and then went outside. While Floris was eating his stew Ferantos asked him to go out and get him a pint of beer, and gave him the money to pay for it. Floris went out and got the beer and gave it to Ferantos, and sat down and finished his stew and went out; that then the defendant came in and passed between the witness and Ferantos through an open door into an adjoining bedroom, where the defendant usually slept, and, without saying a word, fired from the bedroom upon Ferantos while he was sitting upon the bench drinking the beer; that Ferantos fell off the bench upon the floor, and the defendant then advanced and fired the other shots into his body as Ferantos lay there. De Varney testified that before the shooting there was no appearance of hostility or unfriendliness between the defendant and Ferantos. Floris left before the shooting and did not hear it. He corroborated

De Varney as to what occurred while he was in the defendant's room. The defendant was soon after arrested and taken to the police station, where he was examined, through one Sperco, an interpreter, by the police captain or in his presence. The captain wrote down the defendant's statement as the interpreter rendered it and the defendant signed it. It is as follows:

" POLICE DEPARTMENT OF THE CITY OF NEW YORK,
" PRECINCT No. 19.
" NEW YORK, *Feb.* 18, 1899.

" 6:45 P. M. John Zigouras states through interpreter that about three days ago Peter Minaky gave him $13 to buy a revolver. And when Ferrando would come in our room to shoot and kill him. The next day in the room Peter Minaky and myself were talking over the matter. Afterward, on the street, I met Nickelos, who told me that Minaky had gave me money to buy a pistol, and to go ahead and shoot him. Peter Minaky told me he would get a lawyer to defend me, and nothing more would be heard about it. Both Nickelos and Minaky advised the killing of Ferrando, and aided me by advancing money to buy the pistol with which I did the killing. Personally I never had trouble with Ferrando, or no cause to injure him. I did it to please Nickelos and Minaky.
" JOHN ZIGOURAS.

" Sworn to before me this day at }
7:22 P. M., February 18, 1899.   }
" WALTER L. THOMSON,
" *Inspector of Police.*"

The defendant was a witness in his own behalf on the trial. He testified that he did make the above statement to the interpreter at the police station, except that he did not say that he shot Ferantos to please Nickelos and Minaky. He testified that a young Greek, a stranger to him, not the inter-

preter Sperco, first came to him in the police station and talked Greek to him, and advised him to make such a statement. He also testified: " I was very much frightened, and I didn't know where I am, and in what condition I am, and that man talked to me in Greek and I told him the story, and he said, ' You are a fool to tell it in that way.' " That a young Greek, not produced as a witness, did converse in Greek with the defendant at the police station, before Zerco, the interpreter, arrived, was shown by other witnesses. The police captain tried to use him as an interpreter, but he spoke English so imperfectly that the effort was abandoned. The policeman, Casassa, who arrested the defendant, testified that the young Greek interpreted the defendant as saying that " when Ferantos came into his room the defendant told him to get out, and instead of getting out Ferantos took a weapon and went to hit him, and that he then took the pistol from his pocket and shot him." Several witnesses testified to the effect that the interpreter Zerco was directed to inform the defendant that he need make no statement, that it could be used against him, and the interpreter, Zerco, testified that he did fully so inform him. The defendant did not testify at all upon this point. The defendant in his testimony gave substantially the same version as did De Varney of what took place in the kitchen up to the time that Floris finally left it. He testified that thereupon Ferantos said to him: " You will give me ten dollars," and defendant replied, " I haven't got ten dollars to give you. When I had money, I always gave it to you, but I haven't any now to give you." That Ferantos then said in Greek, referring to De Varney, " This here is a detective, a detective policeman, who is with me," and defendant again said, " I haven't any money to give you." That Ferantos then told De Varney to lock the door, and De Varney got up and put his back against it, and then Ferantos said, " Now, you will give me ten dollars or I will take your head," and that he took a poker belonging to the stove and lifted it up as if to strike him, and again said, " You

will give me ten dollars, or I will take your head." That the defendant then said, " Don't kill me, don't kill me, Mr. Ferantos," and shouted " Help! help! " That the defendant retreated into his bedroom followed by Ferantos, who held the poker so as to strike him, and that defendant then took his pistol which was under his pillow and shot Ferantos. He added, " I thought that if I did not, he would kill me." The defendant was corroborated as to his cry for help by one Manoucas, also a Greek, who testified that he heard his cries, and recognized his voice, but the jury evidently did not believe him. No poker was found in defendant's rooms; a broken beer glass was found under the body of Ferantos as he was lifted up; a search disclosed that Ferantos had some money, a diamond stud, a watch and chain, but no weapon upon his person. The autopsy tended to show that at least one of the shots was fired into the prostrate body of the deceased. Ferantos was large and tall; the defendant, a small man. Evidence was given tending to show that Ferantos' character for violence was bad, and that the defendant's character was good. The case was clearly one for the jury, and but for the exceptions now to be noticed, the judgment should be affirmed.

One Kusobalos, a witness for the defense, testified that the character of the deceased for violence was bad. On cross-examination by the People the witness testified that he had considerable feeling against the deceased, and added, " I don't like him, because he treated me very badly. I treated him well; I gave him to eat and drink. He nearly killed me in his room." Question: " You had a little trouble with him?" Answer: " Yes, sir; I was afraid of him," and he pointed to a scar on his own forehead. Redirect: " I ask you to state what that trouble was." Objection. Sustained. Exception.

The trouble was a new fact brought out by the People upon cross-examination. Confessed and unexplained, it tended to impair the force of the direct testimony. The trouble stated and understood might have removed or lessened the discredit

which it tended to produce; might have restored the direct evidence to its original force, and possibly have increased its force.   It was clearly competent.   The general rule is that a witness may upon redirect examination explain the new facts brought out upon cross-examination.   People v. Buchanan, 145 N. Y. 24; Clark v. Vorce, 15 Wend. 193.

The main objection to permitting this explanation is one of convenience.   Of course the trial should not be prolonged or the real issues obscured by the trial of false or immaterial ones.   This calls for the exercise of good sense upon the part of the trial court in limiting the details of the explanation, but it does not call for its exclusion.   The cases cited tending to support the latter proposition are of other jurisdictions. While the range in details to which the re-examination may extend should rest largely in the discretion of the court, to the end that immaterial issues may not arise, enough should be permitted to prevent a part of the truth from conveying a false impression.   We cannot say that the defendant's case was not prejudiced by the ruling.

The defense requested the court to charge the jury " That they may consider, in determining as to whether the defendant had reasonable grounds for believing that he was in imminent danger of death or great personal injury from the deceased, that the deceased, prior to the shooting, had made threats to the defendant that he would kill or injure him." The court said, " Refused, because the basis for making it is not borne out by the evidence."   We have already set forth the testimony of the defendant as to the threats made by Ferantos immediately before the defendant shot him.   The threats of the deceased, if the jury should have found that there were such, should have been considered by them in determining whether the defendant had reasonable grounds for believing that he was in imminent danger of death or of great personal injury.   The defendant would naturally act upon appearances, and the law judges the act from the standpoint of the defendant's reasonable apprehensions from the

appearances. To hold that there was no basis in the evidence for such a request might have been understood as holding that the. defendant's testimony was not true. It is suggested that the court could understand the request as referring to threats upon some former occasion, of which there was no evidence. Such misunderstanding by the court would no less prejudice the defendant.

This is a capital case. The evidence presents a crime of naked and motiveless enormity. The defendant's previous good character is so attested that we naturally look for some justification or excuse. The defendant proffered the justification or excuse of threatening acts of violence, made more alarming by the threatening words accompanying them, and he properly asked for an explicit instruction as to his right to act according to the import of the threatening words. It may be that other parts of the charge can be construed as covering and complying with this request. But the difference between a direct charge upon this point and a general charge in which the point needs to be discovered and identified by constructive processes, may involve the life of the defendant. It is quite possible that this case has another side than the one upon which the defendant has been convicted; therefore, we should not be swift to destroy, but indulgent rather to the defendant's prayer for another trial.

We think that for these errors a new trial should be granted.

In view of a new trial, we think it proper to say with respect to the written statement signed by the defendant at the police station, that upon the whole evidence touching it, it is far from clear as a matter of fact, still less as a matter of law, it was voluntarily made. It was received in evidence before the defendant had testified respecting it, and without any request by his counsel that he should be permitted to testify. In this respect the case differs from People v. Fox, 121 N. Y. 449, and we do not hold that it was error to admit the statement. But in view of the testimony subsequently given by the defendant respecting it, we think it was the defendant's

right to have it submitted to the jury whether the statement was a voluntary one, with the instruction to disregard it if they should find that it was not. The statement charges Minaky and Nickelos with instigating the murder, and furnishing defendant with money to buy the pistol to accomplish it. Minaky was a witness for the People and testified that he furnished the defendant with no money to buy a pistol, but was not asked respecting his alleged instigation. Nickelos was not called. Apparently this part of the defendant's written statement was assumed to be false. Defendant testified that it was. But if so assumed, the testimony of the defendant as to his motive or the provocation given him is all that remains to show why he shot the deceased. The case in this respect is quite unlike People v. Meyer, 162 N. Y. 357. There the confession of the defendant was so completely in harmony with all the facts and circumstances otherwise proved as to carry conviction to the mind that the defendant voluntarily made it, because, as he in effect expressed it, it was of no use to make a denial or tell anything but the truth, because the facts spoke for themselves. The defendant did not request that the question whether the statement was a voluntary one be submitted to the jury, and thus perhaps waived his right. We need not decide, as upon a new trial the question may not arise.

The testimony of the witness Manoucas, to the effect that Ferantos and a Frenchman called upon him in Sixteenth street the day of the homicide between noon and one o'clock, and that Ferantos said, " Now I will go to a place in Fifteenth street and I will ask for ten dollars from the man there; then if I do not get the ten dollars, I will break the umbrella on his head, and I will make his head as soft as dough," was stricken out upon the objection of the People, apparently because the man referred to was not identified with the defendant. At the time of this ruling the identification was not so clear as it afterwards became. It is probable that upon another trial, if the testimony is desired, the identification will

be made in due time. If it is true that the case has no mitigating features, another trial will more clearly show it.

The judgment of conviction should be reversed and a new trial granted.

PARKER, Ch. J. (dissenting).—The facts of this case are so fully and carefully stated in the opinion of Judge LANDON that, for the sake of brevity, they are adopted in this expression of dissent from the views therein relating to certain exceptions taken upon the trial. A summary, however, of the prominent facts is necessary in order to present aptly the questions as to which we are at variance; they are as follows:

On the eighteenth day of February, 1899, the defendant fired four pistol shots into the body of Sarantos Ferantos, killing him. Emil J. De Varney, an eye witness, so testified and the defendant admitted it. No one else saw the shooting, and the witness and the defendant differed mainly as to the circumstances immediately preceding the shooting, and as to whether all the shots were fired before Ferantos, fell, or whether the last three were fired into his body after he had fallen. De Varney testified that while he and Ferantos were drinking beer defendant passed through the room into an adjoining bedroom, where the defendant was accustomed to sleep, and without saying a word, fired therefrom upon Ferantos, who at once fell to the floor, the defendant advancing and firing three other shots in rapid succession while the body was upon the floor. De Varney also said that prior to the shooting there was no appearance of hostility or unfriendliness between the defendant and Ferantos. The result of the autopsy tended to support the testimony of De Varney, for it strongly indicated that some of the four bullets that were found in the body of Ferantos were fired after he had fallen upon the floor. In this connection I quote from the record part of the examination of the defendant by his counsel:

" Q. How many shots did you fire?

"A. I don't know; I couldn't tell; I don't know how many times.

"The INTERPRETER: He says, 'If I hadn't done it he would have killed me; he would have taken my head off.'

"When he said to the stranger to stand at the door, and came at me with the iron, then I fired once and then he fell, and I don't know how many times I fired again."

This part of the testimony of the defendant corroborated De Varney in so far as he testified that Ferantos fell after the first shot, and that the other shots were fired into his body after he was down. The witness immediately corrected this testimony by denying that he fired at Ferantos after he had fallen upon the floor, and insisting that all of the shots were fired at him while he was standing or falling. The claim of the defendant upon the trial was that he shot Ferantos in self-defense. He testified, in effect, that Ferantos demanded money of him, and when he refused to give it that Ferantos said: "Now, you will give me ten dollars or I will take your head," and at once took up an iron poker, and raising it as if to strike, said: "You will give me ten dollars or I will take your head;" that the defendant begged Ferantos not to kill him, retreating at the same time into the bedroom, where he took the pistol from under the pillow and shot Ferantos. The defendant further testified that he believed at the time he fired the shots that his life was in danger, and that he would have been killed had he not shot Ferantos. This version of the matter De Varney flatly contradicted, and it was shown by others that upon the person of Ferantos was found money and jewelry, but no weapon of any kind, while an examination of the room failed to disclose the presence of an iron poker; under the dead man was found a broken beer glass from which De Varney testified Ferantos had been drinking, and there was other evidence that he had but a few minutes before obtained some beer for the purpose of drinking it.

After the testimony had been closed and counsel had sub-

mitted their addresses to the jury, the recorder, in a charge rarely surpassed in the accuracy with which are applied the appropriate legal principles to the situation presented by the evidence, submitted the case to the jury with the result of a verdict of murder in the first degree. If we were satisfied that the verdict thus rendered was against the weight of evidence, or against law, or that justice required a new trial, it would be our duty to reverse the judgment of conviction entered on this verdict, whether or not any exceptions had been taken pointing out errors of law. Code of Criminal Procedure, section 528. But we are agreed not only that the evidence presents a question for the jury as to whether the defendant was guilty of the crime of murder in the first degree, but also that it strongly supports the verdict rendered that an occasion is not presented which will permit the exercise of the great power conferred upon this court by the section above referred to, which was intended for the purpose, among others, of enabling the appellate court to assure an accused a fair trial and protect him from a conviction based upon inadequate evidence.

There is another section of the Code of Criminal Procedure that ought not to be lost sight of by the courts in reviewing judgments of conviction, which provides: " After hearing the appeal the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties." Code of Criminal Procedure, section 542.

This statute has been frequently invoked in cases where the defendant was convicted of murder in the first degree; People v. Chacon, 102 N. Y. 669; People v. Wayman, 128 N. Y. 585; People v. Fanning, 131 N. Y. 659; and it should be applied in every case where it is apparent that the technical errors of which complaint is made do not affect the substantial rights of the parties, because in criminal cases the People, as well as the defendant, have rights which require that the salutary rule provided for by section 542 should be

fairly enforced and administered so as to foster the public policy therein embodied for the purpose of serving the ends of criminal justice. If it be true, therefore, that the two exceptions which are considered in the prevailing opinion point out technical error, and it seems to me very clear that they do not, they should be disregarded if it appears that the substantial rights of the defendant were not affected by the rulings of the court to which they refer.

One of these exceptions was taken to the refusal of the court to charge the following request:

"They may consider, in determining as to whether the defendant had reasonable grounds for believing that he was in imminent danger of death or great personal injury from the deceased, that the deceased, prior to the shooting, had made threats to the defendant that he would kill or injure him."

The court stated its reason for refusing this request as follows:

"The fourth request is refused because the basis for making it is not borne out by the evidence."

If the request referred to threats on the part of Ferantos to kill or injure the defendant, made prior to the occasion which resulted in the death of Ferantos at the hands of the defendant, which was the way the court understood it, then the request was properly refused, for the record contains no such evidence. If the threats referred to in the request were those testified to by the defendant as occurring almost immediately preceding the shooting, then the refusal of the court was justified and proper, for the reason that the court had fully and fairly charged the jury upon this subject, as will fully appear from the following extracts from the charge:

"The defendant has taken the witness stand in his own behalf. He has testified, in substance, that the deceased seized a poker and threatened to kill him if he did not give him the sum of ten dollars; I think he used the words 'threatened to knock his head off.' That the defendant told him he had no money to give him. That he withdrew into the inner room,

and went to a bed there and took from beneath the pillow of the bed the revolver with which the shooting was done, and that he stepped, I think he said, two paces or a few paces from the bed, and shot the deceased before the deceased entered the room where he was; and he states that he fired the shots rapidly; that is, he illustrated to you as if he fired the shots in rapid succession. The number of shots he was not certain of; but he fired shots—he could not tell the number—at the deceased as the deceased was going toward the threshold of the inner room.

" He testified that at the time he fired those shots he believed his life was in danger, and, acting on that belief, he fired the shots at the deceased.

" Now, gentlemen of the jury, that testimony on the part of the defendant raises a defense known in law as self-defense; and upon what constitutes self-defense I will read to you the opinions of our highest court to guide you in your determination as to whether or not this defendant was justified in firing that revolver at the body of the deceased."

The court then read extracts from the opinions in several cases in this court, after which the charge continued as follows:

" If this defendant believed—honestly believed—that he was in imminent danger of death, or of great bodily harm, at that time, and that there were no means of escape with safety except by firing these shots at the deceased's person, then he was justified in so doing and should be acquitted.

" The law of self-defense is founded upon the law of necessity. That is an instinctive rule of action in all human beings —the law of necessity—and that is what the law of self-defense is. These rules formulated by the courts are in conformity with that law, and if this defendant honestly believed at that time that he was in imminent danger of death or of great bodily harm, and that there were no means for him to escape with safety from that danger but by firing those shots,

then he was justified in so doing, and he is entitled to a verdict of acquittal."

At the request of the counsel for the defendant the court further charged the jury in relation to this subject as follows:

"It is not necessary for the jury to believe or find that the defendant was actually in danger of death or great personal injury at the time he shot the deceased, but the defendant had the right to act on the appearances as they appeared to him at the time, and if he had reasonable ground for the belief of imminent danger he was justified in shooting the deceased, and should be acquitted."

"If there is a reasonable doubt as to whether the defendant was acting under a reasonable belief that he was in imminent danger of death or great personal injury from the deceased when he shot the deceased, the jury must give the defendant the benefit of the doubt, and acquit him."

"The jury may consider the condition of the defendant and the deceased at the time of the shooting, and if the jury believe that the deceased attacked the defendant with an iron poker, and the defendant had reasonable ground to believe that great personal injury was to be inflicted upon him, and that danger was imminent, he was justified in killing the deceased."

"In determining the question as to whether the defendant had reasonable grounds to believe that he was in imminent danger of death or great personal injury from the deceased, the jury are not to be governed by what their belief would be under similar circumstances, but are to consider what the defendant believed at the time of the shooting, and if the defendant honestly believed that it was necessary to shoot deceased in order to save himself from death or great personal injury, the jury must acquit the defendant."

"The jury may take into consideration the reputation of the deceased for violence, and the defendant was justified at the time of the shooting in taking into consideration the bad character of the deceased. The defendant was justified in

taking into consideration the reputation of the deceased for violence; and if his reputation, coupled with that attack made upon the defendant by the deceased with the poker, afforded a reasonable ground of belief to the defendant that he was in imminent danger of death or of great personal injury, the jury must acquit the defendant."

It will be seen, therefore, that if the request which was refused referred to the threats that the defendant testified were made immediately preceding the shooting, and the court did not so understand it and so stated to counsel, the subject-matter of it had already been fully and fairly covered in the charge in chief and the defendant was not entitled to have it again charged, and it necessarily follows that the refusal to charge as requested was not error.

The other exception relied upon for the reversal of the judgment was taken to a ruling of the court refusing to allow a witness, who was called to prove that the general reputation of the deceased for violence was bad, and who said on cross-examination that he had had a little trouble with the deceased, to state on his redirect examination what that trouble was.

That evidence tending to show specific acts of violence towards the witness is inadmissible is well settled. In People v. Druse, 103 N. Y. 655, the judgment under review convicted the defendant of murder in the first degree, and the court said: "The rule is that after evidence has been given by a defendant, tending to show that the homicide was committed in self-defense, he may follow it by proof of the general reputation of the deceased for quarrelsomeness and violence. But a defendant is confined to proof of general reputation, and evidence of specific acts of violence toward third persons is inadmissible." Citing People v. Lamb, 2 Keyes, 360, 371; Eggler v. People, 56 N. Y. 642, and Thomas v. People, 67 N. Y. 218.

But the contention is, as I understand it, that while evidence touching any trouble with the witness was not admissible as evidence in chief, yet the door was opened for its

admission by the cross-examination. The witness testified on his direct examination, in effect, that the general reputation of the deceased in the community for violence was bad, and the character of this testimony was such as naturally led the learned district attorney, who conducted the trial with ability and at the same time with a careful observance of the rights of the defendant, to cross-examine the witness as follows:

" Q. You have considerable feeling against the deceased, I should judge?

" A. Yes, sir; I don't like him, because he treated me very badly; I treated him well; I gave him to eat and to drink.

" Q. Then you had a little trouble with him yourself; answer yes or no?

" The INTERPRETER: He says, ' he nearly killed me in his room;' he says he had; he says, ' yes.' "

It will be observed that the district attorney was attempting to show, as was his right on cross-examination, bias on the part of the witness, but he was careful to avoid any inquiry as to whether the deceased or the witness was at fault; he contented himself with showing a feeling of hostility on the part of the witness towards the dead man; but, notwithstanding that his question confined the witness to the answer " yes or no," as to whether he had had trouble with the deceased, the interpreter said that the witness replied to one of the questions: " He nearly killed me in his room," and the defendant's counsel quickly seized upon this answer, which was not called out by the district attorney, as an excuse to get before the jury an occurrence which he well knew he had no right to prove; his ruse is apparent from the fact that, instead of claiming that the evidence was competent generally, he said to the court, in response to its ruling that the evidence was not admissible: " I submit he (referring to the district attorney) has opened the door." There would have been some foundation for this claim had the district attorney called out the statement of the witness that the deceased nearly killed him in his room; but, as we have observed, nothing of the

kind was done; on the contrary, the question in terms confined the witness to the answer "yes or no" to the query whether he had had trouble with the deceased, and he was, therefore, not responsible for the statement interjected by the witness, and, hence, there was no foundation for the claim of counsel that such interjection constituted such an opening of the door by the district attorney as would let in the history of a transaction otherwise inadmissible.

On the way to this point I have said, as one step in the argument in support of the ruling of the trial court, that it was the right of the district attorney to inquire of the witness, on cross-examination, whether he entertained ill-feeling toward the deceased. This is so because the direct testimony of the witness was directed to the inquiry whether the deceased had a general reputation for being violent. His general reputation, therefore, in this respect, and in this respect only, was at issue, and to that extent the district attorney was called upon to defend his general reputation. The witness having testified that the general reputation of the deceased in this respect was bad, the district attorney was at liberty to inquire whether the witness had any ill-feeling against the dead man. Whether this ill-feeling were well founded or without any reasonable basis was of no moment, for it was sufficient for his purpose to prove that he was prejudiced against the dead man, that such fact might be considered by the jury in determining the weight that should be given to his testimony. Rapalje's Law of Witnesses (page 338) states the rule as follows: " If the witness admits on cross-examination that he entertains unkind feelings toward the party, it seems that he cannot be asked the cause of those feelings. Prejudice may be shown, but the facts and circumstances causing such prejudice cannot be stated in detail." In Thompson on Trials (Vol. 1, page 398) it is said: " The rule is that the witness may be interrogated as to the *state* of his feelings toward one of the parties, but that it is not competent to inquire into the *cause* of such feelings." In State v. Glynn, 51 Vermont, 577, it was held that

the inquiry put to the witness as to whether he is unfriendly to the party against whom he has testified is so far collateral to the issue that detail will nòt be permitted, but only the inquiry whether he is unfriendly or not.  In Polk v. State, 62 Ala. 237, it was held that the enmity or unfriendliness of a witness to the person against whom he testified, may be shown to enable the jury the better to determine, in connection with other evidence, what weight should be accorded to the witness; but that it is not permissible to prove the details of a quarrel or difficulty which gave rise to the enmity or unfriendliness. In Conyers v. Field, 61 Georgia, 258, a witness, who had testified against the plaintiff, on cross-examination testified that he had unkind feelings toward the plaintiff.  The defendant thereupon insisted that it was his right upon redirect examination to ascertain the cause of those feelings, and the witness was permitted, against the objection and exception of the plaintiff, to give the details of the trouble between him and the plaintiff. On appeal this was held to be error, and the judgment in favor of the defendant was reversed.  Other cases to the same general effect are: Bishop v. State, 9 Georgia, 121; Cornelius v. State, 12 Ark. 782, 800, and Butler v. State, 34 Ark. 480.  Our attention has not been called to any authorities asserting a different rule.  In People v. Buchanan, 145 N. Y. 24, this rule was not the subject of discussion. There the defendant, on cross-examination of the People's witness, inquired as to a conversation between the witness and the coroner, and the court justly said: " It was proper enough and just that the jury should be placed in possession of what the conversation actually was.  *  *  *  Even if the cross-examination has been as to facts not admissible in evidence, the rule seems to be that the witness may be re-examined as to evidence so given."  But in this case, as we have seen, the district attorney did not on his cross-examination inquire of the witness touching any transactions between him and the deceased, but instead kept well within the rule which entitled him on cross-examination to inquire of the witness whether he

entertained hostile feelings toward the deceased. It follows that if the view expressed be sound the court was right in sustaining the objection. But if the rule were otherwise than as asserted by the cases cited, and any authority could be found for the proposition that a mere inquiry on cross-examination as to whether the witness was at enmity with the deceased operated to open the door so as to let in on redirect examination evidence which this court asserted in People v. Druse, supra, was inadmissible, it would be our duty, in obedience to the command of section 542 of the Code of Criminal Procedure, to disregard the error, for, if ever there was a case in which the evidence excluded could have no important effect upon the result, this is such a case.

The judgment of conviction should be affirmed.

MARTIN and VANN, JJ., concur with LANDON, J., for reversal, and BARTLETT, J., concurs with LANDON, J., on second ground stated in his opinion, viz., the error in refusing to charge as requested; O'BRIEN and HAIGHT, JJ., concur with PARKER, Ch. J., for affirmance.

Judgment of conviction reversed, etc.