[No. 23284. Department Two. September 11, 1931.]

THE STATE OF WASHINGTON, *Respondent,* v. GEORGE
MILLER, *Appellant.*[1]

*J. Fraser Caldwell,* for appellant.

*Chas. W. Greenough,* for respondent.

[1]Reported in 2 P. (2d) 738.

BEELER, J.—The defendant was charged by information with the crime of murder in the first degree. The trial resulted in a verdict of guilty as charged and a special verdict or finding by the jury that the death penalty should be inflicted. From the judgment and sentence pronounced on the verdict and special finding, this appeal followed.

The jury were warranted in finding that, prior to and on October 30, 1929, John Ivester was in the employ of the American Railway Express agency at Spokane, Washington, engaged as a money and settlement clerk. Shortly after office hours, at about six o'clock in the evening of October 30, 1929, Ivester was in the money pen of the office counting the day's receipts. William G. Johnson, another employee of the express company, was sitting at a nearby table writing postal notices notifying various consignees of the arrival of shipments of goods. These two men were the only persons in the office at that time.

Suddenly and without any warning, a shot rang out, followed by a loud moan or sigh. Ivester was shot and died immediately. Hearing the shot, Johnson sprang to his feet and saw a man standing in front of the cage with a gun in his hand. He ordered Johnson to put up his hands, and forced him at the point of his gun into a room at the rear of the express office, and shouted or called out to a confederate, referred to in the information as "John Doe," whom Johnson did not see, "Go ahead. I have the back end covered." He ordered Johnson to lie on the floor and to hold up his hands, and tied them with a shoestring. Johnson identified the appellant as the man who had tied his hands, and also recognized the gun as being a Colt's automatic 45 caliber pistol. The appellant and his confederate robbed the express office of $601, and then made their get-away in an automobile, drove to some

point beyond the corporate limits of the city of Spokane, where they split the "swag."

Later, some police officers and a deputy sheriff went to the express office, where they found a bullet and shell in the back room where Johnson had been forced to lie on the floor, and found another bullet and shell in the cashier's cage. The deputy sheriff, an ex-army officer and a captain of the National Guard, identified the two bullets and the two shells as Frankfort Arsenal ammunition fired from a Colt's automatic 45 caliber pistol, and testified that the cartridges were of a peculiar type used for national rifle matches at Camp Perry, Ohio, in 1927. A merchant in Spokane, who had known the appellant for some three years, testified that, on the evening of October 26th, 1929, the appellant came to his place of business and bought a Colt's automatic 45 caliber pistol; that he had sold the appellant a box of ammunition containing bullets and shells similar to the bullets and shells found by the officers, and that it was an odd type of ammunition manufactured at the Frankfort Arsenal in 1927.

The officers also found a package of cellonap in the express office. A Mrs. Bell, a witness on behalf of the state, testified that, on October 29, 1929, she had sold a package of cellonap to two men which compared in size, shape and appearance to the one found by the officers.

Violet Touissant testified on behalf of the state that she had known the appellant since 1928; that she knew him as George Dively, George White, and Cummings; that, from August to October, of 1929, she saw the appellant intermittently in and about the Milwaukee Hotel at Spokane, where she was employed; that, on the evening of October 29, the appellant came into her room at the Milwaukee Hotel and negotiated with her to buy her Pontiac automobile, agreeing to pay the

sum of eight hundred dollars therefor, stating that he would have the money the following evening, as he expected to "take the express office that night." She next saw the appellant about two o'clock the next afternoon as she was parking her car near the Savoy Hotel in Spokane; that, at about five o'clock on the same afternoon, the appellant came to her apartment in the St. Helens, accompanied by a man whom he introduced as "Bill"; that appellant was carrying a grip from which he took two guns, one a large gun and the other a small one. He gave the smaller gun to "Bill," and the other he stuck in his trousers. In the grip was a small package similar to the package of cellonap found by the officers in the express office following the robbery, and similar to the one sold by Mrs. Bell at Britt's store to two men on the 29th day of October.

This witness further testified that, about seven o'clock on the evening of October 30, as she went to work at the Milwaukee Hotel, she found that her Pontiac automobile had disappeared from the place where she had parked it. The next evening, the appellant, under the name Cummings, called her by phone from some place undisclosed by the evidence. During the conversation, she informed him she had reported the theft of her car to the police at Spokane, whereupon he requested her to inform the police officers that she had found her car. Two days later he called her from Helena, Montana, stating that the police had "grabbed" his car, but that he could procure its release if she would send him a bill of sale for the car under the name of Frank Moore. In this conversation, he directed her to take his grip at the Milwaukee Hotel and burn it, which she did. The following day he called her from Butte, Montana. Later, she went to Montana and recovered her car.

James W. Jewett, clerk of the Placer Hotel at Helena, Montana, identified the appellant as the man who had registered at that hotel on the afternoon of October 31, under the name George Moorer.

Finally the appellant was apprehended, and three officers brought him by train from Bryan, Ohio, to Spokane, Washington. While en route, a conversation occurred between one of the officers and the appellant, during which the latter admitted he had participated in the robbery of the express office, but denied he fired the shot into the body of Ivester; admitted he had taken the Pontiac coupe automobile belonging to Violet Touissant, and that he and his confederate had used it in driving beyond the city limits, where they split the "swag," and thereafter he alone drove to Helena, Montana; admitted he ordered Johnson into the rear room at the point of a gun, and tied his hands with a shoestring.

■ Objection is made to the information on the ground that it is duplicitous. Omitting the formal parts, the information charged:

"That the said George Miller, alias George Burnside, alias Robert Mitchell, alias George White, alias George Black, alias George Dively, alias George Moore, alias George Moorer, and John Doe, whose other and true name is to the Prosecuting Attorney unknown, in the city of Spokane, state of Washington, on or about the 30th day of October, 1929, then and there being, did then and there wilfully, unlawfully and feloniously, without excuse or justification and with a premeditated design to effect the death of one John M. Ivester with a pistol loaded with powder and leaden bullets and while engaged in the perpetration of the crime of robbing the said John M. Ivester of the money of the Railway Express Company, a corporation, of which said money the said John M. Ivester was then and there in lawful charge, custody and control, which said pistol so loaded with powder and leaden bullets as aforesaid,

the said defendant George Miller, alias George Burnside, etc. . . . then and there held in his hand and shot and discharged the same at, upon and into the body of the said John M. Ivester, and by the means aforesaid inflicted upon the said John M. Ivester a mortal bullet wound, of which said bullet wound the said John M. Ivester did then and there die; . . ."

Here the information substantially followed the statute. The statutes of the state (Rem. Comp. Stat., § 2392) defining the different degrees of murder provide that the killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed either with a premeditated design to effect the death of the person killed, or, without design to effect the death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a robbery. The information charged but one crime, that of murder in the first degree.

True, the information charged the murder of Ivester in the conjunctive: first, with a premeditated design to effect his death; and second, while robbing him. That the state may so charge has been sustained in the case of *State v. Fillpot,* 51 Wash. 223, 98 Pac. 659. There the information was attacked for duplicity. It was said:

"It is apparent that it charges but one crime, that of murder in the first degree. While it is true that the statute specifies more than one way in which that crime may be committed, and although the information following its language alleges that the appellant killed N. M. Cole purposely and of his deliberate and premeditated malice, and while engaged in the perpetration or attempt to perpetrate the crimes of robbery and burglary, yet the act of killing as charged constitutes but a single offense. The information is not bad for duplicity."

Four assignments of error are based upon certain instructions submitted to the jury. No exceptions

were taken to those instructions, as required by the rule, by the counsel who then represented the appellant in the lower court. But, this being a capital case, we will waive the rule and consider the question raised as though proper exceptions had been taken.

■ The appellant argues that, inasmuch as the information charged premeditated homicide, the burden was on the state to prove it. We are satisfied that the state did establish premeditation. The evidence clearly shows that the appellant purchased a 45 caliber Colt's automatic pistol, a few days prior to the murder of Ivester, together with a peculiar type of cartridges; that he appeared at the room or apartment of Violet Touissant about an hour prior to the murder with two guns in his grip, and told her he was going to "take the express office;" that he kept the larger gun and gave the smaller one to his confederate; that the bullets and shells found at the office of the express company by the officers after the murder had been committed were of the same kind and caliber as those purchased by the appellant a few days previously; that Ivester was shot down without a chance for his life. When the appellant entered the express office and saw two men present, he may have very hastily concluded that it was advisable to dispose of Ivester so he would have but one man to contend with. It is unnecessary for any appreciable period of time to elapse for premeditation to exist.

"A person can form a premeditated design to effect the death of another for the purpose of better enabling him to rob the person or premises of that other." *State v. Evans,* 145 Wash. 4, 258 Pac. 845.

■ Nor did the court in the four instructions complained of withdraw from the jury the question of premeditated design, but the jury were instructed that, if they found from the evidence beyond a reasonable

doubt that the assault was committed while the defendants were engaged in robbing Ivester, it was immaterial whether the assault was made with a premeditated design to effect his death, as design was implied from the crime of robbery in which the defendants were engaged. This was in conformity with the holdings of this court.

"It is unnecessary to prove that the person who kills another in the commission of rape, or the attempt to commit it, or in withdrawing from the scene of its commission, had any malice, design or premeditation. The proof of the killing, together with the fact that it was committed in connection with a rape, is sufficient to constitute murder in the first degree. . . . The real charge against the appellant was the killing; the rape was an incident qualifying the homicide as murder in the first degree." *State v. Whitfield,* 129 Wash. 134, 224 Pac. 559.

See, also, *State v. Moretti,* 66 Wash. 537, 120 Pac. 102; *State v. Landaker,* 138 Wash. 267, 244 Pac. 555; *State v. McMahon,* 145 Wash. 672, 261 Pac. 639.

The appellant next contends that the court erred in refusing to strike the various aliases from the information. This motion was made prior to the trial. The affidavit of the prosecuting attorney in resisting the motion set forth that the appellant, prior and subsequent to the commission of the murder, used these aliases for the purpose of concealing his identity so as to escape detection and arrest. The affidavit further set forth that the use of these aliases by the appellant was a fact and circumstance that the state was entitled to prove at the time of the trial as bearing on the guilt of the appellant. At the trial, the state did establish that the appellant had been known by, and used, the names of George Dively, George White, George Moorer, George Moore and Cummings at vari-

ous times. This evidence was competent, and hence the trial court properly denied the motion.

The appellant did not testify on his own behalf, and offered no testimony denying that he used and was known by the five aliases proven by the state. True, the state failed to prove that the appellant had used or been known by the names of George Burnside, Robert Mitchell, and George Black, but since the appellant's then counsel made no motion to strike these three aliases, either at the close of the state's case or at any time before the cause was submitted to the jury, no error can now be predicated thereon.

We are satisfied that the appellant was given a fair and impartial trial, and that there was no error of law therein.

The judgment appealed from is affirmed.

TOLMAN, C. J., MILLARD, BEALS, and MITCHELL, JJ., concur.