[No. 28311. Department One. August 22, 1941.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN BRUCE ANDERSON, *Appellant.*[1]

[1]Reported in 116 P. (2d) 346.

*Harold M. Gleeson* and *Lucius G. Nash,* for appellant.

*C. C. Quackenbush* and *R. Max Etter,* for respondent.

BLAKE, J.—On information filed by the prosecuting attorney of Spokane county, the defendant was charged with the crime of murder in the first degree in that, "on or about the 13th day of July, 1940," he

"did . . . willfully, unlawfully and feloniously, without excuse or justification and *with a premeditated design* to effect the death of one David Johnson, *and*

*while engaged in the perpetration and attempt to perpetrate the crimes of burglary and robbery,* kill and murder said David Johnson in a manner and by means unknown to the Prosecuting Attorney." (Italics ours.)

He was found guilty, as charged, by a jury, which imposed the death penalty. From judgment and sentence entered in accordance with the verdict, he appeals.

The appeal presents four major questions for determination: (1) Was the state's proof of the *corpus delicti* sufficient to take the case to the jury? (2) Should the court have instructed on murder in the second degree and manslaughter? (3) Was evidence of a burglarious entry of deceased's dwelling by appellant on May 29, 1940, admissible? (4) Did the court err in denying appellant's motions to make the information more definite and certain and for a bill of particulars?

*First.* The deceased Johnson lived on an eighty-acre farm, which he owned, six or seven miles southwest of Spokane. He was thrifty and well-to-do, having a checking account of several hundred dollars and a savings account of three thousand dollars in the Old National Bank and Union Trust Company of Spokane.

For several months prior to July 13, 1940, appellant "camped" in the vicinity of the Johnson place. About July 28th, he broke camp and went to Yakima. He was taken into custody at a ranch near Toppenish on August 28th. When apprehended, he had in his possession several of Johnson's personal belongings, notably a marriage license, patents and deeds to property, a check book, savings account book, and letters to Johnson from his daughter.

He admitted the killing of Johnson and, on August 29th, signed a confession circumstantially describing the murder, the disposal of Johnson's body, and his

own subsequent acts and movements. The highlights of the confession are:

That he had been in the habit of going to Johnson's place every night for the purpose of stealing eggs; that he always took his gun, a .38 Ivor-Johnson revolver, with him "for protection"; that he "figured on using it" if he "would have to"; that, on the night of July 20th, he took his gun and went over to Johnson's and entered the barn where the chickens were kept, but found no eggs; that he heard the screen door of the house, which was a hundred yards away, open and realized Johnson was coming; that he ran out of the barn and hid in some bushes nearby; that Johnson entered the barn and then came out and began searching the ground for tracks with a flashlight; that Johnson came toward him with the flashlight in one hand and a revolver in the other; that he trained his gun on Johnson when the latter started toward him—at a distance of about ten paces; that he called to Johnson to drop his gun; that Johnson and he fired at the same instant "and [he] shot him through the heart"; that he then took the body to the house and put it in the cellar—first bringing the "legs up against his chest," because he knew "probably rigor mortis would settle in" before he could "take him away and it would be hard to put him in the car"; that the next night he went back and got the body and drove to Newport, where he threw it in the Pend d'Oreille river; that he then "went on back to Spokane," but, having no money, he went *"over to Coeur d'Alene," where he sold Johnson's revolver for five dollars.*

The confession continues: That, on Monday, July 22nd, he went back to Johnson's place and made a search, hoping and expecting to find money; that, finding none, he then *"went to Coeur d'Alene and sold that gun"*; that Johnson had a .410 shotgun, which he,

after the murder, "peddled at Spokane—on Main Avenue between Brown and Bernard—a kind of sporting goods and radio store"; that he drew checks on the checking account standing in the name of David Johnson in the Old National Bank and Union Trust Company; that, representing himself as David Johnson, he listed the Johnson ranch for sale; that he went to Yakima, representing himself to be David Johnson; that, as such, he drew drafts to the amount of fifteen hundred dollars on the Johnson savings account in the Old National Bank and Union Trust Company, the proceeds of which he deposited in the Yakima branch of the National Bank of Commerce of Seattle under the name of David Johnson; that, as David Johnson, he drew checks on that account; that, in connection with the attempt to sell the Johnson ranch, he executed an affidavit identifying himself as the David Johnson who owned the ranch; that, assuming the name of David Johnson, he rented a post office box at Selah.

In challenging the sufficiency of the proof of the *corpus delicti,* appellant first complains that the confession was admitted in evidence before the *corpus delicti* was established.

■ ■ It is a well-settled rule of practice that the *corpus delicti* must be established before the admission of evidence linking the defendant with the crime charged. This rule, however, has a certain practical. and well-recognized limitation, which is stated in 1 Wharton's Criminal Evidence (11th ed.), 235, § 210, as follows:

"But in many cases, the two matters are so intimately connected that the proof of the corpus delicti and the guilty agency is shown at the same time. Hence, the order of proof in a criminal case is generally within the discretion of the trial court, and this prevails so generally that error committed in admitting testimony as to the guilt, before the proof of the corpus

delicti, is cured where the subsequent testimony sufficiently establishes the corpus delicti."

That counsel for the state meticulously observed the rule within all practical limitations, is apparent from the facts which we shall now relate.

■ Although the *corpus delicti* cannot be established by confessions and admissions of the defendant standing alone, it is to be borne in mind that they may be considered for that purpose, together with other facts and circumstances tending to prove the *corpus delicti. State v. Coats,* 22 Wash. 601, 61 Pac. 726; *State v. Scott,* 86 Wash. 296, 150 Pac. 423, L. R. A. 1916B, 844; *State v. Gray,* 98 Wash. 279, 167 Pac. 951; *State v. Marcy,* 189 Wash. 620, 66 P. (2d) 846; *State v. Stuhr,* 1 Wn. (2d) 521, 96 P. (2d) 479. See, also, *State v. Anderson,* 132 Wash. 130, 231 Pac. 456.

■ To begin with, a thorough search of the Pend d'Oreille river failed to discover a body. In the meantime, it was learned that, about three o'clock in the morning of July 16th, a hay barn located between half a mile and a mile to the west of the town of Athol, Idaho, burned to the ground. Athol is twenty miles north of Coeur d'Alene and about thirty to the south of Newport. The barn was about half a mile to the north of the main highway, but only one hundred yards from a road that connected with the main road between Athol and Newport. (In 1938, appellant had lived for several months on a ranch some ten or twelve miles north of Athol.) By a witness who observed the fire from Athol, it was described as bursting out as by an explosion.

On July 17th, while the fire was still smouldering, a lieutenant of the Idaho state police examined the ruins and found in one corner the form of a human body. He testified:

"Well, the human body was all there so far as the bones were concerned. The flesh has been burned almost entirely away. There was a small part of the torso remaining, and I noticed the skull and the entire portion of the body."

He reported the discovery to the coroner, a practicing physician of Coeur d'Alene, who, with a deputy sheriff, went out to investigate and remove the remains. Incineration had been so complete, however, that the bones disintegrated when touched. Some teeth and a portion of the torso were all that could be moved. In sifting the ashes, however, the searchers found, midriff of the body's position, a belt buckle engraved with the initial "D."

Appellant contends that, conceding the remains found were those of a human being, the proof falls far short of establishing that they were those of a male, much less the remains of David Johnson.

The coroner testified that, in his opinion, the remains were those of a man. The belt buckle was described by Johnson's son in accurate detail before it had been shown to him. Later, when it was shown to him at the trial, he identified it as belonging to his father and related the circumstances under which his father had purchased it. A neighbor of the deceased's and Johnson's daughter also identified it. Enlarged kodak pictures of Johnson admitted in evidence, show him wearing a belt. In one, the letter "D" on the belt buckle can be clearly seen.

But this is not all the proof relating to the *corpus delicti*. While the following evidence directly tends to connect the appellant with the crime, it also goes to establish the *corpus delicti*. Johnson's revolver was sold by appellant in Coeur d'Alene on July 15th, instead of July 22nd as stated in his confession. When confronted with this fact, appellant admitted the mur-

der must have occurred on July 13th, instead of July 20th. When told of the finding of the charred remains near Athol and pressed for an explanation, appellant said, " 'That can't be true . . . That couldn't be true, if I put him in the river, could it?' "

Among appellant's effects when he was taken into custody was a diary, in which he had made an entry as of July 13th, "Johnson . . . was very sick, gun shot wound"; and an entry as of July 15th, "big fires break out in Ida."

The *corpus delicti* must, of course, be established beyond a reasonable doubt. But the fact of death may be found either by direct or circumstantial evidence or both. 30 C. J. 285, § 530; *Timmerman v. Territory*, 3 Wash. Terr. 445, 17 Pac. 624; *State v. Downing*, 24 Wash. 340, 64 Pac. 550; *People v. Clark*, 70 Cal. App. 531, 233 Pac. 980; *People v. Hanson*, 359 Ill. 266, 194 N. E. 520; *Edmonds v. State*, 34 Ark. 720; *State v. Winner*, 17 Kan. 298; *McCulloch v. State*, 48 Ind. 109. Without recapitulating the evidence above narrated, we believe it all but conclusively establishes the fact that the charred remains found in the ashes of the barn near Athol were those of David Johnson.

■ *Second.* Appellant requested the court to submit second degree murder and manslaughter to the jury. This request seems to have been predicated on two theories, both based upon the double aspect of the information. It will be recalled that the information charges appellant with premeditated murder and homicide while engaged in a burglary or robbery. In passing, it may be noted that informations in such double aspect have long had the approval of this court. *State v. Fillpot*, 51 Wash. 223, 98 Pac. 659; *State v. Miller*, 164 Wash. 441, 2 P. (2d) 738.

■ Viewing the evidence in the light of the charge of premeditated murder, was appellant entitled to in-

structions submitting murder in the second degree and manslaughter to the jury?

The rule is, of course, well established that a homicide, admitted or proved beyond a reasonable doubt, is presumed to be murder in the second degree. *State v. Duncan,* 101 Wash. 542, 172 Pac. 915; *State v. Smith,* 115 Wash. 405, 197 Pac. 770. But the rule is not a mere abstraction to be stated for its own sake. The court is not required to define murder in the second degree for the jury unless the facts of the case admit of a verdict of murder in the second degree. *State v. Pepoon,* 62 Wash. 635, 114 Pac. 449; *State v. Foley,* 174 Wash. 575, 25 P. (2d) 565. In the *Pepoon* case, it was said:

"It is no doubt true that the crime of murder includes the lesser crimes of murder in the second degree and of manslaughter, and it is equally true that the jury has a right to determine the degree of crime which was committed. But that determination must, of course, be based upon evidence. That is all that gives the determination any value. The anxiety of the law is to give the defendant the full benefit of trial by jury on all questions of fact, and it will not give its sanction to a farcical and arbitrary determination of any alleged fact which the jury has had no possible means of determining. . . . There is no room under the testimony for any other theory, and no testimony whatever upon which any other verdict than the one rendered could have been based. Hence, it would be farcical to reverse the judgment on the ground complained of."

Notwithstanding that appellant, in his confession, said he shot Johnson while he (appellant) was engaged in stealing eggs, counsel for the state tried the case on the theory of premeditated murder. The appellant did not take the stand, nor did he offer any evidence with reference to the homicide. We have set out the essential facts made by the state's evidence, and we find nothing that would warrant a verdict of

murder in the second degree or manslaughter. The fact that, after shooting Johnson, he trussed the body and stowed it in the cellar preparatory to hauling it away in an automobile the next night, precludes any inference that the killing was spontaneous and without premeditation.

Now let us consider the evidence in the light of the charge that the homicide was committed while appellant was engaged in a burglary or a robbery. The statute, Rem. Rev. Stat., § 2392 [P. C. § 8997], subd. 3, defines homicide committed under such circumstances as murder in the first degree. Appellant contends, however, that the killing in this instance does not fall within the definition because, at the time of the shooting, he had abandoned his burglarious enterprise and was withdrawing from the scene. His contention is that the proof fell short of the crime as charged in the information, and that the killing did not amount to murder in the first degree under Rem. Rev. Stat., § 2392, subd. 3. In support of this position, he relies chiefly on two New York cases: *People v. Marwig*, 227 N. Y. 382, 125 N. E. 535, 22 A. L. R. 845, and *People v. Moran*, 246 N. Y. 100, 158 N. E. 35.

These cases seem to support appellant's position, holding that, where burglars had left the premises where a robbery was perpetrated, a homicide committed in the course of their flight did not constitute murder in the first degree unless premeditated. In other words, if the killing is done in the course of flight, it cannot be said to have occurred during the perpetration of the burglary. Consequently, it was held that failure to instruct on murder in the second degree was error.

There are other New York cases, however, which mark a distinction in the rule of those cases when the homicide is committed on the premises where the

felony is perpetrated. *People v. Meyer,* 162 N. Y. 357, 56 N. E. 758; *People v. Huter,* 184 N. Y. 237, 77 N. E. 6; *People v. Giro,* 197 N. Y. 152, 90 N. E. 432; *People v. Michalow,* 229 N. Y. 325, 128 N. E. 228. These cases more nearly fit the facts of the instant case. Appellant was on the premises of the deceased's and was not in the course of flight when he shot.

In any event, we think the better rule, and the rule supported by the weight of authority, is stated in 26 Am. Jur. 283, § 190, as follows:

"A homicide is, however, committed in the perpetration or attempt to perpetrate another crime when it is committed by the accused while engaged in the performance of any act required for the full execution of some crime other than the homicide, which the accused intends to commit, and the homicide is so closely connected with such other crime as to be within the res gestae thereof."

A similar statement of the rule, quoted with approval in *State v. Diebold,* 152 Wash. 68, 277 Pac. 394, is to be found in 13 R. C. L. 845, § 148. Noteworthy applications of the rule in cases where burglary is the basis of the first degree murder charge may be found in the decisions of *Conrad v. State,* 75 Ohio St. 52, 78 N. E. 957, 6 L. R. A. (N. S.) 1154, and *People v. Boss,* 210 Cal. 245, 290 Pac. 881. Applying the rule in *State v. Whitfield,* 129 Wash. 134, 224 Pac. 559, this court said:

"From the very nature of things—and the evidence in this case illustrates the situation as well as any case could—it is often impossible for the state to know at just what instant a killing was committed, whether it was done in the commission of a felony, or in attempting to commit a felony, or while withdrawing from the scene of a felony. The facts here show that there were blows on the head of the child which may have been inflicted before the rape took place, or after the rape had been committed, or may have been inflicted while the accused was withdrawing from the

scene. The child's throat was also cut, and the same uncertainty exists as to when that mortal wound was inflicted. It is impossible to tell whether the wounds to the head or throat occasioned the death. Under such circumstances, to compel the state to make a choice as to the exact instant that an unwitnessed killing took place is, by a technicality, to embarrass justice. . . .

"Objection is made that the court did not submit to the jury instructions covering the crimes of murder in the second degree and manslaughter, and did not permit the jury to return a verdict other than first degree murder or not guilty. There is no evidence in the case upon which the court would have been justified in submitting the lesser crimes of murder in the second degree and manslaughter to the jury. The killing took place in connection with a rape, and it was therefore murder in the first degree or nothing, and there is no evidence introduced by the appellant to show that there were any elements of murder in the first degree lacking, or that there were elements necessary to constitute murder in the second degree or manslaughter."

Considering the evidence on this aspect of the case, the killing was clearly an incident, a part of the *res gestae*, to the burglary. Appellant went there to steal —armed and ready to shoot if necessary to protect himself. He anticipated the eventuality, and, when it transpired, he acted accordingly. The homicide cannot be disassociated from the burglary. Viewing the charge in either aspect, as a premeditated murder or as a killing incident to the commission of, or attempt to commit, the crime of burglary, the evidence did not warrant instructions on murder in the second degree or manslaughter.

■ *Third.* Johnson's house was burglarized on May 29, 1940. At that time, a watch, a .410-gauge shotgun, and a suitcase were taken. Johnson reported the burglary to the sheriff's office. The shotgun was located at a second-hand store in Spokane, where

Johnson redeemed it. Appellant admitted the burglary and selling the shotgun at the second-hand store where it was found.

Appellant urges that evidence of this burglary was inadmissible.

The general rule is, of course, that evidence of other crimes may not be introduced to establish the crime charged. There are, however, several well-recognized exceptions to the rule. One such is where the crime charged is so connected and related to another crime as to give evidence of the latter probative value in proving the former. *State v. Gottfreedson,* 24 Wash. 398, 64 Pac. 523; *State v. O'Donnell,* 195 Wash. 471, 81 P. (2d) 509; *State v. Richardson,* 197 Wash. 157, 84 P. (2d) 699. Upon appellant's own story of the shooting, as related in his confession, evidence of the burglary of May 29th had a direct bearing upon the killing of Johnson.

Describing the scene at the chicken house, he said that he knew Johnson "had a .410 shotgun"—as if in justification for arming himself for his own protection when he invaded Johnson's premises to steal. Further, in apparent justification for covering Johnson immediately the latter started toward him, appellant stated in his confession: "I knew he was a Montana man—from talking to him down at the mail box—he said he was from Montana." From these statements, it is apparent that appellant was attempting to justify the murder, at least in his own mind, by the imputation that Johnson was a "bad man" from Montana who would not hesitate to use a gun. Since appellant learned about the shotgun through his burglary of Johnson's house on May 29th, evidence of that crime was relevant and material in corroborating his confession and in establishing the crime charged.

*Fourth.* As we have stated, the double aspect

in which the information was drawn is sanctioned by the decisions of this court. *State v. Fillpot* and *State v. Miller, supra.* Such an information is not duplicitous. Nor is it defective in not stating in specific detail the facts and elements of the burglary or robbery upon which the crime of murder in the first degree is charged under Rem. Rev. Stat., § 2392, subd. 3. The state's case was necessarily based upon and built around the confession and admissions of appellant. We cannot conceive of any fact which the state, by way of bill of particulars or by way of making the information more definite and certain, could have furnished him that was not already locked up in his own breast.

Judgment affirmed.

ROBINSON, C. J., MAIN, STEINERT, and DRIVER, JJ., concur.

[1]Reported in 116 P. (2d) 360.