[No. 31639. Department One. July 26, 1951.]

THE STATE OF WASHINGTON, *Respondent*, v. GEORGE W. FRY, *Appellant*.[1]

[1]Reported in 234 P. (2d) 531.

*Will Lanning* and *Bill Lanning,* for appellant.

*Alden B. Whelan,* for respondent.

BEALS, J.—By an information filed May 4, 1950, in the office of the clerk of the superior court for Island county, the prosecuting attorney of that county charged George W. Fry with the crime of manslaughter, committed as follows:

"He, the said GEORGE W. FRY, in the County of Island, State of Washington, on or about the 21st day of April, 1950, then and there being, did willfully, maliciously remove, damage and destroy an electric transmission line and apparatus connected with the operation thereof, by which act GEORGE W. FRY then and there willfully, unlawfully and in a wanton, reckless and grossly negligent manner inflicted grievous wounds upon the body of R. B. BOWYER from which wounds he then and there died; that the willful, unlawful and malicious destruction of said electric transmission line and apparatus connected with the operation thereof, by said GEORGE W. FRY was the direct and proximate cause of the death of R. B. BOWYER; Contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Washington."

The defendant, having been arraigned, entered a plea of not guilty and, in due time, was put upon his trial. By its verdict, the jury found the defendant guilty of the crime of manslaughter. Defendant's counsel thereupon moved for arrest of judgment or, in the alternative, for a new trial, this motion having been denied by order entered October 17, 1950. On the same day, the court sentenced the defendant to imprisonment in the state penitentiary for a maximum term of not to exceed twenty years, with a recommended minimum of eighteen months. The court then signed the formal written judgment and sentence, bearing

date October 17, 1950, from which judgment the defendant has appealed to this court.

Error is assigned upon the court's refusal to "grant appellant's motion for a directed verdict of not guilty for the reason that the State had failed to prove its case beyond a reasonable doubt"; upon the court's instructions Nos. 5, 6, 7, and 8; and upon the court's refusal to give appellant's proposed instructions Nos. 1, 2, 3, 4, and 8. Appellant assigns no error upon any ruling of the trial court in connection with the introduction of evidence.

During the month of April, 1950, and apparently for some time prior to that date, appellant was foreman of the Puget Sound Power and Light Company's "line crew," and in charge of the company's distribution system in and around the town of Langley in Island county.

At about 9:30 p. m., April 21, 1950, the power lines in the town of Langley ceased to operate. A few minutes thereafter, C. T. Peterson, an officer of the state patrol, started an examination of the area north of the town. He testified that he proceeded along state highway No. 1-D and, about 10:00 p. m., at a point a little less than one and one-half miles south of the town of Freeland, he saw the body of a man lying on the south shoulder of the road. The body was burning and the ankles rested across a fallen power line pertaining to the system of the Puget Sound Power and Light Company which, when in operation, carried about twelve thousand volts. After the body had been removed from contact with the power line, examination of a billfold identified the victim as Ransom B. Bowyer.

About three hundred fifty feet from the body and fifteen feet off the road, a flashlight was found which was introduced in evidence on the trial as exhibit A. A trouble light (exhibit B) was found near the power pole from which the wire had fallen, and nearby was also found an appliance (exhibit C), described as "hot line cutters," used for the purpose of cutting wire while it is carrying power. These cutters are a rather heavy two-handled appliance about three feet, eight inches in length.

Robert L. Bohnert, who was the first employee of the power company to arrive at the scene of the accident, testified:

"There were two spans where the wire was on the ground; there was fire, flames; and as I drove up to the flames I saw this body laying there. Q. Where was the body? A. It was laying approximately either across the wire or under it. I couldn't tell which, but it was right in the midst of these flames, so the man was obviously dead. His clothes were on fire."

The witness testified that he also discovered nearby a "hand line" belonging to the company, and a pair of climbers. Neither of the two objects last mentioned were introduced in evidence on the trial, but the witness testified that he recognized the climbers as belonging to appellant.

Robert C. Haferkorn, called as a witness on behalf of the state, testified that he lived at Langley; that, during the spring of 1950, he was in the employ of the Puget Sound Power and Light Company, having been so employed since January 6th of that year; that he was working as a ground man on the line crew; that, April 21, 1950, the crew stopped work at about 4:30 p. m.; that it was "pay-day night," and the men went to a tavern, where they drank some beer; that he then went home, his wife having invited Mr. and Mrs. Jack Wardell to dine with them; that after dinner the parties talked for a while; and that, when the Wardells left, the witness then went to appellant's house. Asked what he and appellant talked about, the witness answered:

"A. Talked about getting some over-time for the crew. Q. And what was said about over-time? A. Well, we talked about that pole out there by Harbor that had a bad guy on it. [Objection overruled.] Q. Tell the jury, Mr. Haferkorn, what conversation you and Mr. Fry had when you went over to his house after dinner? A. I went over to the house and — [Objection overruled.] Q. Go ahead. A. Well, as I said, I went over there, and George [appellant] talked about getting some over-time for us, and this pole with the bad guy on it out there by Harbor, we'd go out later that evening and cut that wire up there. Q. Cut what wire? A. Well, cut one of the wires. And that would kill the line, then we'd get some over-time. So after I left his place I

went back home, and George and his wife came down— [Objection sustained.] Q. What did you do after you talked with Mr. Fry? THE COURT: And this Court is advising this witness that he is not compelled by law to answer any question, a truthful answer to which may tend to incriminate him: that he is the judge of whether such questions and answers will.

"Q. Go ahead. A. Well, I went back to the house, and about eight-thirty I imagine it was, George and Hilda came down, and they were there for, oh, about a half hour, I guess, and then Peg and I and Kirky and George and Hilda got in George's car and then went down town and parked by the Langley Garage, and George had a key to the office, and the key to the Langley Garage was kept in that office, so he went in the office and got the key for the garage, and we went in the garage and got the tools, and then came back out. Q. What tools did you get? A. Got the hot line cutters. Q. Where did you get the hot line cutters from? A. They were off from Roy Bohnert's pick-up truck. Q. Is that the service man? A. That's the service man. And off of the line truck we got the big trouble light. We have two of them on the truck that we use for trouble at night, for working up on the poles. And then George got his tools. Q. What tools? A. Well, his hooks and belt. Then we went back then out to the car and stopped down in front of the Dog House and got four bottles of beer from there. I happen to know it was about nine o'clock when we were at the Dog House, because they have a big clock right over the counter, and I saw that clock there. Then we left there and went out to Harbor, out where that pole was, and we stopped there, and George and I got out. Q. What tools did you take out of the car? A. We had a hand line also that we got off the truck. We took the hot line cutters, the hand line, the trouble light, and I had my small flashlight."

The witness then testified concerning the flashlight and tools that he and appellant had with them, his testimony continuing as follows:

"Q. What did you do after you took the tools out of the car? A. Well, George put on his hooks, and fastened the hand line on his belt, and went up to the top of the pole. And when he got up there he hollered for the hot line cutters. and I sent them up to him on the hand line. Q. What happened then? A. And he reached out and he clipped that wire. Q. Which side of the pole did he clip the wire on? A. Well,

it would be the side towards Harbor. Q. Is that towards Coupeville? A. Towards Coupeville. Q. How far out on the line did he clip it? A. Oh, I imagine it was a foot and a half. Q. What were you doing while Mr. Fry was clipping the wire? A. Oh, standing along the edge of the road. Q. Were you following his directions? A. Yes. I was staying out of the way. Q. Did he give you any instructions? A. No; other than turn out the light there when a car came along. Q. What else happened at this place? A. Well, after cutting the wire, he dropped the hot line cutters to the ground, and came down the pole. And then we went across the street. Both of us went across. He cut the guy wire with the hot line cutters. Q. Who cut the guy wire? A. George. I held the light there. Q. What did you do then? A. Well, after cutting that guy, we went back out to the road there and laid the tools down there, and then Peggy and Hilda came back from Harbor. They had went up and turned around and come back and picked us up, and we headed then right back for George's house."

The witness testified that he had noticed some fire starting where the power wire was lying on the ground, "little fires springing up all over"; that later in the evening a telephone message reached them telling them that the crew was to "stand by"; and that, shortly thereafter, another telephone call came in from either Roy Bohnert or Fred Rinehart, stating that a man had been killed. Asked if appellant Fry then said anything to him, the witness answered:

"Well, he remarked that he had killed a man and he felt awful bad about it, and was sort of half crying. And we started out the door to go down and get the truck and get out there."

Appellant denied committing any of the above-described acts, testifying that at the time of the accident he was at home playing cards with the witness Haferkorn. Evidence introduced by appellant tended to show that the power line in that neighborhood was in bad repair and that the pole carrying the wire which fell to the ground was in very poor condition, appellant's theory being that the line was broken because of the generally defective condition of the system.

The prosecution introduced in evidence its exhibit D, being a piece of the power wire obtained by Jack Wardell, a lineman in the employ of the power company. This witness testified that he went to the scene of the accident with appellant, in answer to a telephone call from the witness Bohnert; that, when he arrived, someone was using fire extinguishers to extinguish the flames around the body lying on the bank, and that the wire was down. The witness further testified that he climbed the power pole; that one end of the high-tension wire had dropped and was lying on the ground; and that, under direction from appellant, he cut a piece off the end of the wire which had been severed, marking the end which he cut with his pliers. The witness identified the state's exhibit D as the piece of wire he had cut, and also testified that the pole had been recently climbed by another person prior to the ascent of the witness.

Called as a witness on his own behalf, appellant testified that for about twelve years he had been employed as an electrical lineman and had acted as foreman for the last seven years of that period; that, on the evening referred to, he telephoned the witness Haferkorn, stating: "I told him over the phone that I had a little 'nip' over there, and to come on over and I'd buy him one"; that Haferkorn came over; and that, about 8:30 p. m., appellant and his wife went to Haferkorn's home, where a bottle of whiskey was opened, the party indulging in a few drinks. Appellant and his wife, with Mr. and Mrs. Haferkorn, then drove to town, where Haferkorn purchased four bottles of beer. They then drove around casually and returned to appellant's home. The witness testified that, shortly after this, Mr. Rinehart telephoned, telling the witness that the line was out of order and asking him if he was available for work. Presently the electric lights ceased to function, candles were lit, and the witness changed his clothes, expecting a call for duty. The call came, and the witness then picked up Jack Wardell and went to the scene of the accident.

The witness testified that; after his arrival at that point, he "walked on down to this place where the old gentleman

was, but there was nothing that could be done for him then," and that someone then informed appellant that his car was on fire, so he returned to his car and evidently attended to that problem.

The witness testified that he was "the boss on the job," and directed Bohnert, Wardell, and Haferkorn in their work.

Appellant denied that on the day in question he cut any power line, causing it to fall down, or that he cut any guy line attached to a guy pole, permitting the power pole to sway. The witness testified that he had not been to the place in question during April 21st to examine the guy line and that he did not "even know where the place was." He testified that his pay was adequate, that he had plenty of work, and that he did not desire any overtime. He further testified that the wire system in question was in bad shape.

Concerning his acts at the scene of the accident, appellant testified that he directed Wardell to climb the pole and cut off the end of the broken wire and turn the segment over to him, with which latter order Wardell did not comply. The witness further testified that cutting the wire while it was carrying a heavy load of electricity would be dangerous, saying:

"It's the hazardous part of the work in which, if something might break it could come in contact with the workman."

The following then occurred:

"Q. And when that line breaks away, it throws an arc to the nearest ground? A. Well, yes, it would. Any line that is carrying a load. Q. And such an arc would be fatal, wouldn't it? A. Well, yes, it could be. Q. It would have to be, wouldn't it—13,000 volts? A. If it comes in contact with the body, yes."

On cross-examination, the witness testified that he had frequently used "hot line cutters." He testified that he did not climb any pole April 21st. The following then occurred:

"Q. Did any of your crew call attention to you of fresh hook marks on the pole? A. They might have said something about that. Q. Weren't you a bit curious? A. No, I wasn't. Q. Weren't you foreman of the crew? A. But there

were other people there to carry on the investigation. It wasn't up to me."

Appellant called two witnesses, one of them, Leland Roth, testifying that he was appellant's superior; that appellant was a general foreman; and that his reputation was good.

Appellant also called David J. Klinman, a business representative for the electrical workers' union, who testified that he had known appellant for about three years, and that he bore a good reputation "for truth and honesty."

Pursuant to his first assignment of error, appellant argues that the state failed to introduce evidence showing appellant's guilt beyond a reasonable doubt, and that the court erred in denying appellant's motion for a directed verdict of not guilty.

Rem. Rev. Stat., § 2391 [P.P.C. § 117-3] reads as follows:

"No person shall be convicted of murder or manslaughter unless the death of the person alleged to have been killed and the fact of killing by the defendant, as alleged, are each established as independent facts beyond a reasonable doubt."

In *State v. Anderson*, 10 Wn. (2d) 167, 116 P. (2d) 346, this court said:

"The *corpus delicti* must, of course, be established beyond a reasonable doubt. But the fact of death may be found either by direct or circumstantial evidence or both."

This principle is, of course, well established in our law.

In the case at bar, the deceased was identified as Ransom B. Bowyer. Appellant argues that, as counsel for the state did not ask any witness who saw Bowyer's body lying on the shoulder of the road if Bowyer was dead, the state failed to prove the *corpus delicti*.

Several witnesses called by the state referred to "the body," testifying as to where it was lying, and that it was on fire.

On cross-examination, appellant was asked, "What difference was there about this case than any other case of trouble you have on your lines?" Appellant answered: "The fact a man was killed."

On redirect examination, appellant was asked the following question:

"Q. Now, you had never, prior to the 21st day of April, worked on a job where a man was killed as the result of coming in contact with a hot wire? A. Not killed outright, no."

On cross-examination of the state's witness Bohnert, appellant's counsel asked him: "When you arrived out at the scene of the death of this old gentleman, were you alone?"

During the cross-examination of the state's witness Wardell, appellant's counsel asked the witness:

"Q. Well, now, on this evening of the 21st, you first learned that a death had occurred out there when you were up at Mr. Rinehart's home, didn't you? A. Yes, sir. Q. And it unnerved you? A. Yes. Q. You have dealt with sudden death with your work for about some four years now, haven't you? A. Yes, sir. Q. A lineman is always just a kiss away from it, isn't he? A. Yes. You hear about it, and you work with it, and those that get 'burned'."

█ The record does not disclose that, at any time during the trial, appellant or his counsel even suggested any question concerning the fact that Bowyer was dead.

In the case of *People v. Lagroppo*, 90 App. Div. 219, 86 N. Y. S. 116, the court was concerned with the identification of a corpse that had been buried, being the victim of an assault committed by the defendant in the action. Apparently there was no direct evidence establishing the identification, but, on appeal, the supreme court, appellate division, held that, where both the prosecution and the defendant assumed, during the progess of the trial, that the person the defendant was charged with killing was the same person who was dead and buried, more direct proof was not necessary to support the judgment of conviction. On appeal, the judgment was affirmed. *People v. Lagroppo*, 179 N. Y. 126, 71 N. E. 737.

The case last cited is referred to with approval in 3 Warren on Homicide (Perm. ed.) 109, § 270. While the case cited did not concern the precise question presented in the

case at bar, the reasoning of the New York courts is pertinent.

We hold that the evidence introduced by the state sufficiently established the *corpus delicti*.

■ Appellant argues that the record contains no evidence which clearly shows that Bowyer's death occurred in Island county or in the state of Washington. The testimony before us, in connection with the circumstances which resulted in Bowyer's death, is replete with references to the towns of Langley, Freeland, and Coupeville, and also to Whidby island and Island county, these names having been frequently used as reference points to determine the location of the events connected with the falling of the wire and the death of Bowyer.

In the case of *State v. Bennett*, 6 Wn. (2d) 208, 107 P. (2d) 344, referring to venue in a prosecution for a criminal offense, we said:

"Venue need not be established by direct testimony. It is sufficient if the evidence shows indirectly or circumstantially that the venue was properly laid."

This statement is followed by the citation of many of our previous decisions.

We hold that, from the record before us, it clearly appears that Bowyer's death occurred in Island county, state of Washington.

In connection with his first assignment of error, appellant also argues that, as the evidence before the court tended to show that the power line in question was in bad condition, the breaking of the power wire might well have resulted from some defect in the system itself.

■ The jury heard the evidence and apparently believed the testimony of the witnesses called by the state. The record contains nothing which would justify a holding that, as a matter of law, the jury was not entitled to believe the testimony of the state's witnesses.

Appellant bases his second assignment of error upon the trial court's instruction No. 5. Appellant's exception to this

instruction, as disclosed by the statement of facts, reads as follows:

"At this time, the defense wishes to take exception to the Court's Instruction No. 5, in that I feel it states a number of things in there that are confusing, and they are not clear and concise."

■ We have read the court's instruction, which is not subject to the objection made by appellant's counsel. In any event, the exception is vague and indefinite, and is not "sufficiently specific to apprise the judge of the points of law or questions of fact in dispute," as required by Rule of Practice 10, 18 Wn. (2d) 39-a, which was in effect at the time of the trial.

■ The trial court's instruction No. 6 reads as follows:

"I instruct you that manslaughter is a form of homicide, as the last is defined by the law as the killing of a human being by the act, procurement or omission of another, such killing not being excusable or justifiable.

"To constitute manslaughter, a killing of another is not required to be proven to have been done with any design, premeditated or otherwise, to effect the death of that other, but may be consummated by an unintended death of another.

"There is in this cause no evidence tending to prove that the death of R. B. Bowyer was caused and consummated under any state of facts that would render such excusable or justifiable."

To this instruction, appellant's counsel preserved the following exception:

"The defense would like to take exception to the Court's Instruction No. 6. That includes in the instruction a statement to the effect that there is no evidence tending to prove the death of Bowyer was caused under any state of facts that would render it excusable. That statement, I think, is a comment on the evidence in the case."

The record contains no evidence save as hereinabove referred to concerning the manner in which the high-voltage wire became severed.

By his exception above quoted, appellant's counsel stated no objection to the instruction upon the ground that, by its

language, the court assumed Bowyer's death, which event the exception assumes to be a fact.

The instruction is criticized because it told the jury that there was no evidence before the jury to the effect that Bowyer's death was caused and consummated under any state of facts that would render the death excusable or justifiable.

Appellant cites a number of our decisions in support of his argument. In several of these cases, questions concerning an instruction on justification were considered, it clearly appearing that justification was relied upon as a defense to the crime charged. The questions presented in the other cases concern the constitutional provision that, in a jury trial, the trial court shall not comment upon the evidence.

We have examined these cases and find none that are in point. In the case at bar, the defense was an alibi, appellant, of course, not attempting to show excuse or justification, but absolutely denying that he had cut the wire, the breaking of which caused Bowyer's death.

Respondent cites the case of *State v. Britton*, 27 Wn. (2d) 336, 178 P. (2d) 341, in which the trial court gave the jury an instruction concerning justification, although there had been no attempt at the trial to show justification. In the case cited, we held that, although the instruction might well have been deemed erroneous, nevertheless it was harmless error.

In the case of *State v. Clayton*, 32 Wn. (2d) 571, 202 P. (2d) 922, referring to the rule that a trial judge shall not comment on the evidence, we said:

"The constitutional provision that a trial judge shall not charge with respect to matters of fact, nor comment thereon, means no more than that the judge is forbidden to convey or indicate to the jury, by word or act, his personal opinion as to the truth or falsity of any evidence introduced upon the trial. [citing cases.]"

Appellant's assignment of error based upon the trial court's instruction No. 6 is without merit.

By his assignment of error No. 4, appellant complains of the trial court's instruction No. 7, which reads as follows:

"I instruct you that if, after a full and fair consideration of all the evidence in the cause, you shall be convinced beyond a reasonable doubt, as that degree and measure of proof is by later instruction defined to you, that in this county and state and on or about the 21st day of April, 1950 the accused, George W. Fry, did cut in two and sever the line through, over and by means of which electric power and energy was transported and did thereby cause one portion of such line to fall to and lie unguarded upon the ground, and that one R. B. Bowyer came into contact with such and was thereby caused to die by reason of such contact, and that the act of the accused was the direct and the proximate cause of the death of said R. B. Bowyer, then and in that event you will find the accused, George W. Fry, guilty of manslaughter; this, even though you shall not be convinced beyond a reasonable doubt, or at all, that the accused, George W. Fry, intended to cause the death of R. B. Bowyer, or any person.

"Not being convinced of all the foregoing beyond a reasonable doubt, you will find the accused not guilty.

"I instruct you that proximate cause is that cause of a result which, without any intervening sufficient cause, brings about a result which would not have happened or occurred when and as it did, but for it."

Appellant excepted to this instruction "for the reason that that refers to the evidence in the case, and I think amounts to a comment," arguing in his brief that "the word 'shall' as used in this instruction denies the jury the right to use its own judgment in determining the facts." Appellant's criticism is levied against the word "shall" as used in the first portion of the instruction.

■ Clearly, the instruction is not subject to this criticism. While the instruction refers to evidence in the case, it does not comment thereon, but properly instructed the jury concerning the law applicable to certain portions of the evidence, if the jury was convinced that certain evidence introduced by the prosecution was true. Appellant's assignment of error is without merit.

Appellant next assigns error upon the court's instruction No. 8, and presented the following exception:

"And I would like to take exception to the Court's instruction No. 8 relative to the two classes of evidence, be-

cause I think it is so long that it is confusing, and the jury would not get a clear conception of what the Court is stating, and further, to the fact that there is not to my mind, any direct evidence of the commission of the crime by the defendant."

By this instruction, the trial court told the jury that "There are two classes of evidence upon which we must rely to prove or to disprove alleged facts—direct and circumstantial."

The instruction is neither long, involved, nor confusing, as argued by appellant, and was nowise prejudicial to appellant.

Appellant's remaining assignments of error are based upon the trial court's refusal to give certain instructions which appellant requested.

Examination of appellant's proposed instructions which the court refused to give, and the instructions which the court did give to the jury, clearly indicates that the trial court correctly instructed the jury concerning the matters covered by appellant's proposed instructions which the court refused.

Appellant was charged with the crime of manslaughter. The sole question before the jury was whether he was guilty of that crime or innocent. The court properly instructed the jury concerning the law, and did not violate the rule against judicial comment upon the evidence.

The record before us is free from error, and the judgment appealed from is affirmed.

SCHWELLENBACH, C. J., HILL, DONWORTH, and FINLEY, JJ., concur.

---

August 31, 1951. Petition for rehearing denied.