IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32841-4-III |
| Respondent, | ) | (consolidated with |
| | ) | No. 34425-8-III) |
| v. | ) | |
| | ) | |
| MARCO ANTONIO GALLEGOS, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |
| ——————————————— | ) | |
| | ) | |
| In the Matter of the Personal Restraint of | ) | |
| | ) | |
| MARCO ANTONIO GALLEGOS, | ) | |
| | ) | |
| Petitioner. | ) | |

SIDDOWAY, J. — Marco Gallegos appeals his convictions of two counts of

aggravated first degree murder and unlawful possession of a firearm. He contends that

(1) he received ineffective assistance of counsel when his trial lawyer did not request a

cautionary jury instruction on accomplice testimony, (2) insufficient evidence supports

one conviction for aggravated first degree murder, and (3) he was denied his

constitutional right to a speedy trial. We find no error, and that the evidence was

sufficient to support the conviction. For those reasons, and because Mr. Gallegos raises

no meritorious issues in a pro se statement of additional grounds or a consolidated

personal restraint petition (PRP), we affirm his convictions and dismiss the PRP.

FACTS AND PROCEDURAL BACKGROUND

On December 21, 2012, the Kittitas County Sheriff's Office received a report of a car off the road near a diversion dam on the Yakima River with a body in the back seat. On responding, deputies found Ryan Pederson dead in the back seat of a car that belonged to his friend, Michael Eby. They soon found Mr. Eby's dead body wrapped in a sheet in the car's trunk. Both men had been shot.

About six weeks later, while executing a search warrant for the home of Troy Whalen in connection with a robbery and assault of a friend of Mr. Eby's, detectives located materials similar to those used to wrap Mr. Eby's body. They applied for and obtained another search warrant for evidence related to the murder investigation. After their search yielded a sheet matching the one used to wrap Eby's body, they administered *Miranda*[1] warnings to Mr. Whalen, who agreed to talk and identified Jose Pineda, Heriberto Villa, and another Mexican man he did not know as having been involved in the murders of Mr. Eby and Mr. Pedersen. Mr. Pineda was arrested on February 1 and, after *Miranda* warnings, identified Whalen, Villa, and Marco Gallegos as having been involved.

On February 6, 2013, all four men were charged, as principal or accomplice, with the aggravated first degree murders of Mr. Eby and Mr. Pederson, and alternatively, as to

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

Mr. Pederson, with first degree felony murder in the course of or in flight from a first or second degree kidnapping. Mr. Gallegos was also charged with first degree unlawful possession of a firearm. Trial was set for April 1.

*Events leading to the charges*

Mr. Gallegos and his three codefendants have a complicated history. Mr. Gallegos and Mr. Pineda were both members of La Raza, a Norteño gang. Mr. Pineda was a drug dealer for the gang. He sold methamphetamine to Mr. Whalen, who was not a member of the gang, but in whose garage Mr. Pineda and others often hung out, and out of which they ran drugs. In exchange for use of his garage, Mr. Whalen was provided with drugs.

Mr. Villa was not a member of the La Raza gang. He and Mr. Pineda were friends because they used to "tag" (paint their graffiti "signatures" on public and private property) together. David Campos, a member of a Sureño gang, a rival gang to the Norteños, had also been part of the tagging group with Mr. Villa and Mr. Pineda. Mr. Campos and Mr. Villa were friends. And despite being members of rival gangs, Mr. Campos and Mr. Pineda were also friends.

The late Mr. Eby was a drug customer of Mr. Pineda's. At the time of Mr. Eby's death, the two had known each other for about eight months, saw each other about once a week, and often did drugs together in Mr. Whalen's garage. Mr. Eby was not a member of the La Raza gang.

3

Sometime before December 20, Mr. Pineda learned from Mr. Villa, who had heard from Mr. Campos, that Mr. Eby tried to solicit Mr. Campos to rob Mr. Pineda. Angered by the information, Mr. Pineda decided to confront Mr. Eby. He contacted him on December 20 and, on the pretext that he wanted to pay Mr. Eby $600 that Mr. Pineda owed, arranged to meet him at Mr. Whalen's garage that evening. Depending on how Mr. Eby reacted to the accusation that he tried to set him up, Mr. Pineda was prepared to "check" Mr. Eby, meaning "jump him . . . [and b]eat him up." Report of Proceedings (RP) at 1452.

Mr. Pineda arranged for Mr. Villa to be at the garage as backup when he confronted Mr. Eby. When Mr. Pineda happened to run into Marco Gallegos that afternoon, he brought him along as well. Mr. Gallegos was a member and front line soldier of La Raza, and people feared him. On that December 20 evening, both Mr. Pineda and Mr. Gallegos were armed, as they usually were.

After arriving at Mr. Whalen's garage on the evening of the 20th, Mr. Pineda and Mr. Villa smoked methamphetamine. Mr. Gallegos, who did not do drugs, waited with them for Mr. Eby. When Mr. Eby arrived, he was accompanied by his friend, Ryan Pederson. Mr. Eby entered the garage and smoked and talked with Mr. Pineda. Mr. Pederson later entered and joined them.

After smoking and talking for a while, Mr. Pineda confronted Mr. Eby about the reported robbery solicitation. At that time, Mr. Gallegos was standing at the door to the

4

garage, blocking it. Mr. Eby admitted he might have once talked about setting up Mr. Pineda but said that when he got to know him better he decided there was no reason for that. Mr. Pineda asked Mr. Villa to call Mr. Campos and put the call on a speakerphone so Mr. Campos could confirm the solicitation by Mr. Eby. Mr. Villa was able to reach Mr. Campos, who confirmed it was Mr. Eby who tried to set Mr. Pineda up for robbery.

When the phone call ended, Mr. Pineda said to Mr. Eby that "he was gonna get fucked up" and tucked his shirt in to show his gun. RP at 1663. Instead, Mr. Eby preemptively attacked Mr. Pineda. Mr. Eby was able to push Mr. Pineda up against some motorcycles, where he straddled him and struck him in the face, using both fists. After Mr. Eby hit Mr. Pineda hard several times, Mr. Gallegos walked from the doorway to where Mr. Eby was straddling Mr. Pineda, and shot him at point blank range.

Mr. Eby stopped moving and dropped onto Mr. Pineda. Mr. Gallegos grabbed Mr. Eby by the shirt, pulled him off of Mr. Pineda, and shot Mr. Eby two more times. His shots were to the right side of Mr. Eby's head; to his upper right arm, with the bullet passing through the arm and into the chest; and to his mid-chest. The two shots to or through the chest passed through Mr. Eby's heart. The forensic pathologist who later performed an autopsy on Mr. Eby concluded that any of the three shots would have been fatal.

5

Mr. Pineda claims he never intended for Mr. Eby to get shot and when he asked Mr. Gallegos afterwards why he shot him, Mr. Gallegos answered that it was because Mr. Pineda "was getting fucked up." RP at 1474.

After Mr. Eby was shot, Mr. Gallegos told Mr. Pineda to tell Mr. Villa to kill Mr. Pederson, so there would be no witnesses. Mr. Pineda understood that it was good to have Mr. Villa "more involved," to keep him quiet. RP at 1493.

Mr. Eby's body was loaded into the trunk of his own car and Mr. Gallegos, Mr. Pineda, Mr. Villa, and Mr. Pederson—who was still alive at that point—got into the car and drove to Roza Canyon, which Mr. Whalen suggested as a place where they could leave the car, since no one would be there in December. Mr. Whalen drove there separately in Mr. Pineda's car.

The two cars reached the area of the Roza diversion dam at around 11:00 p.m. or 12:00 a.m. Upon reaching the destination, Mr. Gallegos, Mr. Villa, and Mr. Pineda got out of Mr. Eby's car and Mr. Pineda handed his gun to Mr. Villa. Mr. Villa, who would later claim he was afraid that Mr. Gallegos would shoot him if he did not shoot Mr. Pederson, shot Mr. Pederson two times, killing him. Mr. Whalen then drove Messrs. Pineda, Gallegos, and Villa back to his home.

### Procedural history

After being charged on February 6, 2013, Mr. Gallegos continuously asserted his

6

speedy trial rights. Over his continued objection, but with the agreement of at least one

of the other defendants, trial was continued on eight occasions, as follows:

| Trial date | Date request for continuance was granted |
|---|---|
| April 1, 2013 | March 21, 2013; new date: June 24, 2013 |
| June 24, 2013 | June 13, 2013; new date: November 25, 2013 |
| November 25, 2013 | November 14, 2013; new date: December 16, 2013 |
| December 16, 2013 | December 11, 2013; new date: April 14, 2014 |
| April 14, 2014 | April 11, 2014; new date: May 5, 2014 |
| May 5, 2014 | April 30, 2014; new date: July 14, 2014 |
| July 14, 2014 | Effectively on July 14, formalized on July 18, 2014: new date: August 20, 2014 |
| August 20, 2014 | |

Between October 4 and December 2, 2013, Mr. Whalen, Mr. Pineda, and Mr.

Villa, participated in recorded "free talks" with the State. At a status conference on

December 11, 2013, the court and counsel began discussing the *Bruton*[2] issues that would

---

[2] *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). In *Bruton*, the United States Supreme Court held that the defendant's confrontation rights under the Sixth Amendment to the United States Constitution were violated when he was "powerfully incriminat[ed]" by admission of a pretrial statement of his codefendant, Evans, who did not take the stand at trial. *Id.* at 135-37. It held that the Sixth Amendment violation was not prevented by a limiting instruction that the jury could consider the confession only against Evans. *Id.* at 137.

In *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the Supreme Court validated the use of redactions of a codefendant's statement, so that it contains no explicit or implicit reference to the complaining defendant, together

7

be present in the event there was a joint trial in which a codefendant who had provided a statement did not testify. Lawyers for the defendants took the position that there was no amount of sanitation of the recorded statements that would make a joint trial possible, and that the cases should be severed.

While the charges had been filed against the defendants jointly and it was their responsibility under CrR 4.4(a)(1) to move to sever, the trial court believed that the issue of severance and any *Bruton* issues could most effectively be resolved by having the State provide the court and the parties with an early, candid assessment of whether a joint trial was possible, and, if so, how it proposed to redact any recorded statements it proposed to offer. In the court's view, an understanding was reached at the hearing that took place on December 11, 2013, that the State would file a preliminary witness list and either concede the severance issue or present its proposal for a joint trial by the time of a January 31, 2014 status hearing. In hearings on January 31 and February 7, 2014, the court scolded the prosecutor for failing to file the requested materials and refusing to address the severance issue until and unless the defendants filed a motion. Frustrated by the delay in bringing the severance issue to a head, the court established a briefing

---

with a limiting instruction, as means for protecting a criminal defendant's Sixth Amendment rights in most cases. The Supreme Court later held that a defendant's Sixth Amendment confrontation right was not protected where "[t]he blank space in an obviously redacted confession also points directly to the defendant," such that it had the same powerfully incriminating effect as in *Bruton*. *Gray v. Maryland*, 523 U.S. 185, 194, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998).

8

schedule under which the defendants would file motions for severance and those, and any confrontation issues, would be resolved at a hearing on March 7.

The day before the severance hearing, Mr. Pineda and Mr. Whalen entered into agreements with the State to be cooperating witnesses, which the State asserted resolved *Bruton* issues and made severance unnecessary. Mr. Gallegos and Mr. Villa continued to argue that severance would be required in light of Mr. Villa's intent to defend on an allegedly inconsistent basis of diminished capacity, however. On March 28, 2014, the court heard argument on that basis for severance and denied the motion, concluding that Mr. Gallegos and Mr. Villa had not yet demonstrated that their defenses would be inconsistent. Then, on June 26, 2014, after the State conceded that severance of Mr. Villa's and Mr. Gallegos's trials *was* necessary, the court signed an order severing the codefendants' cases. Mr. Gallegos's trial remained set for July 14.

Continuances after the fifth, April 14 trial date were entered for a variety of other reasons. A principal reason was pleas entered into between the State and Mr. Gallegos's codefendants. During this time frame, the State also requested a continuance after belatedly discovering that the forensic pathologist who had performed the autopsies on Mr. Pederson and Mr. Eby was out of the country until August, and it would cost over $20,000 for the county to fly him to Yakima to testify. The court denied that motion to continue. But after a plea agreement with Mr. Villa was entered on July 14, Mr. Gallegos's seventh trial date, the court granted a final continuance of trial to August 20.

9

Mr. Gallegos's trial finally began over 18 months after the charges against him were filed. Mr. Whalen, Mr. Pineda, and Mr. Villa each testified about Mr. Gallegos's involvement in the two murders. Although Mr. Gallegos's lawyer challenged the three accomplices' credibility in cross-examination, he did not propose or request a jury instruction cautioning the jury to carefully examine the testimony of an accomplice.

At the conclusion of trial, the jury found Mr. Gallegos guilty on all counts. The court sentenced Mr. Gallegos to life imprisonment without the possibility of parole. He appeals.

## ANALYSIS

Mr. Gallegos assigns error to (1) ineffective assistance of counsel where his trial lawyer failed to propose or request an instruction cautioning jurors against placing too great a reliance on testimony by accomplices, (2) the insufficiency of evidence to establish that the murder of Mr. Eby was premeditated, and (3) a violation of his constitutional right to a speedy trial. We address the assignments of error in turn.

### I. Mr. Gallegos does not establish prejudice from the absence of a cautionary instruction on accomplice testimony

A Washington pattern jury instruction cautions jurors, consistent with Washington

10

case law, that the uncorroborated testimony of an accomplice should be carefully examined:

> Testimony of an accomplice, given on behalf of the [State] [City] [County], should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.05, at 184 (3d ed. 2008) (WPIC). Mr. Gallegos's trial lawyer did not propose or request that WPIC 6.05 or any similar instruction be given to the jury. Mr. Gallegos argues this constitutes ineffective assistance of counsel.

We review ineffective assistance of counsel claims de novo, engaging in a two-prong test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). First, the defendant must show he received deficient representation. *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995) (citing *Strickland*, 466 U.S. at 688-89). Deficient performance is determined using an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705-06, 940 P.2d 1239 (1997). Second, the defendant must show he or she suffered prejudice as a result of the deficient performance. *Mierz*, 127 Wn.2d at 471 (citing *Strickland*, 466 U.S. at 687). Prejudice will result if "'counsel's errors were so serious as to deprive the defendant of a fair trial.'" *Id.* (quoting

11

*Strickland*, 466 U.S. at 687). "This showing is made when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different." *Id.* (citing *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987)). A reasonable probability is a probability sufficient to undermine confidence in the outcome; it does not require a showing that the outcome would more likely than not be altered. *State v. Tilton*, 149 Wn.2d 775, 784, 72 P.3d 735 (2003) (citing *Strickland*, 466 U.S. at 693-94).

If one of the two prongs of the *Strickland* test is absent, this court need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). And "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

The gist of WPIC 6.05 is that accomplice testimony is suspect, and most suspect when it is uncorroborated. The instruction nonetheless permits the jury to consider accomplice testimony "in the light of other evidence in the case" and even to rely on such testimony alone, if, "after carefully considering the testimony, [it is] satisfied beyond a reasonable doubt of its truth."

The State called over two dozen witnesses during Mr. Gallegos's trial. While three were accomplices, their testimony was materially consistent. And the collective recount of the accomplices was corroborated by other witnesses who were not accomplices, and by physical evidence, such as evidence of Mr. Eby's and Mr. Pineda's cell phone use and location on the night of the murders, and evidence connecting the

12

materials used to wrap and tie Mr. Eby's body to materials in Mr. Whalen's home and garage.

The jury was aware the accomplices had a motive that might lead them to lie. The evidence established, and Mr. Gallegos's trial lawyer argued, that Mr. Pineda and Mr. Villa initially made inconsistent statements to police, denying any involvement in the murders. Mr. Gallegos's lawyer cross-examined them about deals they made with the State in exchange for testifying against his client. Beyond that, Mr. Gallegos's trial lawyer established that Mr. Pineda and Mr. Villa were close friends—much closer than they were to Mr. Gallegos, implicating a motive to lie to protect one, the other, or each other. He established on cross-examination that Mr. Villa had tried to use Mr. Gallegos as a fall guy once before.

Mr. Gallegos's lawyer highlighted the accomplices' drug use, and the fact that his own client did not use drugs. He elicited evidence on Mr. Villa's power in the La Raza gang, and Mr. Gallegos's lack of power.

Although the jurors were not specially cautioned to closely examine the testimony of accomplices, they were instructed, generally, that they were "the sole judges of the credibility of each witness" and "the value or weight to be given to the testimony of each witness." Clerk's Papers (CP) at 1169 (WPIC 1.02). They were instructed that "[i]n considering a witness's testimony, [they] may consider . . . any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness

13

may have shown . . . and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony." *Id.*

Where Mr. Gallegos's trial lawyer ensured that jurors were aware of evidence casting doubt on the credibility of the accomplice testimony and they received the general instruction that they should consider personal interest and bias, Mr. Gallegos fails to demonstrate a reasonable probability that the outcome of trial would have been different had the jury been given WPIC 6.05 or a similar instruction.

## *II. Sufficiency of evidence to support a finding of premeditation*

Mr. Gallegos next argues the evidence was insufficient to support a jury finding that Mr. Eby's murder was premeditated, focusing on the testimony of Mr. Pineda and Mr. Villa that there was no plan to shoot Mr. Eby, and Mr. Villa's testimony that the shooting occurred in a "split second." Br. of Appellant at 23.

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency of evidence admits the truth of the State's evidence and all inferences that can reasonably be drawn from it. *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (quoting *Salinas*, 119 Wn.2d at 201).

A person is guilty of murder in the first degree when "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a

14

third person." RCW 9A.32.030(1)(a). A person is guilty of second degree murder if they

act with the "intent to cause the death of another person but without premeditation."

RCW 9A.32.050(1)(a). "The element of premeditation distinguishes first and second

degree murder." *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109 (1986).

"Premeditation" has been defined as "'the deliberate formation of and reflection

upon the intent to take a human life' and involves 'the mental process of thinking

beforehand, deliberation, reflection, weighing or reasoning for a period of time, however

short.'" *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995) (quoting *State v.

Gentry*, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995)). By statute, the premeditation

required in order to support conviction of the crime of murder in the first degree "must

involve more than a moment in point of time." RCW 9A.32.020(1). The time may be

very short, provided it is a sufficient period within which to reflect or deliberate.

*Bingham*, 105 Wn.2d at 824, 827 (citing *State v. Smith*, 12 Wn. App. 720, 732-33, 531

P.2d 843 (1975), *aff'd*, 88 Wn.2d 127, 559 P.2d 970 (1977)).

Motive, evidence of planning, and the method of killing are particularly relevant to

establish premeditation. *Pirtle*, 127 Wn.2d at 644. "The planned presence of a weapon

necessary to facilitate a killing has been held to be adequate evidence to allow the issue

of premeditation to go to the jury." *Bingham*, 105 Wn.2d at 827. It has also been "held

that evidence showing the victim was shot three times in the head, two times after he had

15

fallen on the floor, was sufficient to establish premeditation." *Gentry*, 125 Wn.2d at 598 (citing *State v. Rehak*, 67 Wn. App. 157, 834 P.2d 651 (1992)).

In *State v. Condon*, 182 Wn.2d 307, our Supreme Court reiterated the reasoning of *Pirtle* that the fact that a defendant embarked on a robbery with a loaded handgun is sufficient evidence from which a rational jury could find premeditated murder, even if the defendant could not have foreseen the precise event that would cause him to kill. It cited *State v. Miller*, 164 Wash. 441, 447, 2 P.2d 738 (1931), in which the court affirmed a conviction predicated on premeditation where, when Miller entered an office, armed, intending to rob it, and saw two men present, "he may have *very hastily* concluded that it was advisable to dispose of [the decedent] so he would have but one man to contend with." (Emphasis added.)

In this case, Mr. Gallegos was in Mr. Whalen's garage, armed, with the intent to provide backup if Mr. Pineda decided to "check" Mr. Eby. This is evidence from which premeditation may be inferred (even though it need not be inferred), in the same sense as premeditation may be inferred where a murder is committed in the course of an armed robbery. A rational juror could find that when it was Mr. Pineda who got "checked," the murder of Mr. Eby was the unsurprising result of the reason Mr. Gallegos was present and armed in the first place. It could find that the murder was the product of reflection, since, according to Mr. Pineda's testimony, Mr. Gallegos waited long enough to see that Mr. Pineda was on the losing end of a fight before he proceeded to where Mr. Eby was

16

straddling Mr. Pineda, fired a foreseeably fatal shot at Mr. Eby, and then pulled Mr. Eby off of Mr. Pineda in order to get two cleaner, foreseeably fatal, shots. The evidence was sufficient.

### III. *Constitutional speedy trial right*

Both the United States and the Washington Constitutions provide a criminal defendant with the right to a speedy trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. A defendant's speedy trial rights under article I, section 22 are coextensive with his or her rights under the Sixth Amendment and the analysis is substantially the same. *State v. Iniguez*, 167 Wn.2d 273, 290, 217 P.3d 768 (2009). This court reviews a defendant's claim that his or her right to a speedy trial was violated de novo. *Id.* at 280-81. If a defendant's constitutional right to a speedy trial is violated, the remedy is dismissal of the charges with prejudice. *Id.* at 282 (citing *Barker v. Wingo*, 407 U.S. 514, 522, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)).

"'It is . . . impossible to determine with precision when the right [to a speedy trial] has been denied.'" *Iniguez*, 167 Wn.2d at 282 (alterations in original) (quoting *Barker*, 407 U.S. at 521). "[S]ome pretrial delay is often 'inevitable and wholly justifiable.'" *Iniguez*, 167 Wn.2d at 282 (quoting *Doggett v. United States*, 505 U.S. 647, 656, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). As a result, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker*, 407 U.S. at 522.

17

In *Barker*, the United States Supreme Court adopted a balancing test that weighs the conduct of the State and the defendant in order to determine whether speedy trial rights have been denied in a given case. It identified four nonexclusive factors as among those the court should weigh: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his speedy trial right, and (4) prejudice to the defendant. 407 U.S. at 529, 530. "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors." *Id.* at 530.

*Delay.* Whether delay is presumptively prejudicial is a fact-specific inquiry. *Iniguez*, 167 Wn.2d at 283, 291. Commentators have observed that in speaking of "presumptive prejudice," the Supreme Court appears not to mean a demonstration of actual prejudice or to contemplate a shift to the prosecution of the burden of demonstrating an absence of prejudice, but "'[p]robably . . . that a claim of denial of speedy trial may be heard after the passage of a period of time which is, prima facie, unreasonable in the circumstances.'" 5 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 18.2(b) at 129 (4th ed. 2015) (quoting H. Richard Uviller, Barker v. Wingo: *Speedy Trial Gets a Fast Shuffle*, 72 COLUM. L. REV. 1376, 1385 (1972)). In this connection, a court should consider the length of delay, the complexity of the charges and the reliance on eyewitness testimony. *Iniguez*, 167 Wn.2d at 292. For example, "a tolerable delay for trial on 'an ordinary street crime is considerably less than for a serious,

18

complex conspiracy charge.'" *Id.* (quoting *Barker*, 407 U.S. at 531). Courts also consider whether the defendant was in custody as well as the amount set for bail.

In *Doggett*, the Supreme Court observed that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." 505 U.S. 652 n.1 (citing 2 WAYNE R. LAFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 18.2(b) at 405 (1984)). Our own Supreme Court has criticized other courts' reliance on *Doggett*'s reference to a one-year period as an abdication of their duty to engage in a fact-specific inquiry in each case. *Iniguez*, 167 Wn.2d at 292.

Applying a fact-specific approach, considerations here that indicate, prima facie, an unreasonable passage of time are that 18 months is a substantial period, that Mr. Gallegos spent the entire time in custody, and that eyewitness testimony came to be a critical part of the State's evidence. *Cf. Id.* (The relative importance in a case of eyewitness testimony "underscore[s] the importance of avoiding delays that could result in witnesses becoming unavailable or their memories fading."). Considerations that indicate, prima facie, that pretrial activity in this case would reasonably take more time than usual are that it involved multiple actors, which *Iniguez* recognized as presenting the potential for greater pretrial delay, *see id.*; the related prospect of negotiations and plea agreements that could transform the character of the case; and, failing that, and with recorded confessions in hand, the State's understandable effort, if feasible, to prepare for

19

a joint trial that it (and the law) would favor. Considering all, we find the roughly 18-month delay was sufficient to trigger a full *Barker* examination.

"'[T]he length of delay is both the trigger for analysis and one of the factors to be considered.'" *State v. Ollivier*, 178 Wn.2d 813, 828, 312 P.3d 1 (2013) (quoting *United States v. Colombo*, 852 F.2d 19, 24 (1st Cir. 1988)). Having determined that the roughly 18-month delay was presumptively prejudicial, we consider "the extent to which [it] stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652. "[T]he longer the pretrial delay, the closer a court should scrutinize the circumstances surrounding the delay." *Iniguez*, 167 Wn.2d at 293. Given the circumstances that suggested that pretrial activities would reasonably take longer than usual, the roughly 18-month lapse between arrest and trial in this case is only minimally out of line with other cases with similar complexities. This factor weighs only slightly against the State.

*Reason for delay.* The second factor is the reason for delay. *Iniguez*, 167 Wn.2d at 284. "'[D]ifferent weights [are to be] assigned to different reasons' for delay." *Id.* (quoting *Doggett*, 505 U.S. at 657) (alterations original). If the State deliberately causes the delay in order to frustrate the defense, the delay will be weighed heavily against it. *Iniguez*, 167 Wn.2d at 284. "Delay . . . due to institutional dysfunctions attributable to the State" by contrast, weighs less heavily against the State. *Ollivier*, 178 Wn.2d at 837.

20

Delay attributable to mere negligence on the part of the State or overcrowded courts similarly weighs against the State, to a reduced extent. *Iniguez*, 167 Wn.2d at 284.

If the delay is at the defendant's request, or if the defendant agrees to the delay, then he or she is deemed to have waived his or her speedy trial rights as long as the waiver was knowing and voluntary. *Id.* "Because 'the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation,' delay caused by the defendant's counsel is also charged against the defendant." *Vermont v. Brillon*, 556 U.S. 81, 90-91, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)).

In *Iniguez*, the defendant objected to four continuances. As in this case, some delays were requested by the State because it had already agreed with a codefendant to continue trial and it wanted to try the cases together. *Id.* at 294. Another was due to the State's need to interview witnesses. Yet another continuance was due to the State's discovery that a key witness had left the country and was unavailable for trial. Our Supreme Court determined that "[o]n balance, none of the continuances can be described as unreasonable, especially in light of the 'policy favoring joint trials,' [*State v.*] *Dent*, 123 Wn.2d [467,] 484, [869 P.2d 392 (1994)], and the juggling that trial courts must do to accommodate the schedules of multiple lawyers and multiple witnesses." *Iniguez*, 167 Wn.2d at 294.

21

In this case, a number of continuances were granted in order to allow the State to prepare for trial. Trial was reset from April 2013 to June 2013, from June 2013 to November 2013, from November 2013 to December 2013, and from December 2013 to April 2014, with the agreement of some other defendants, if not Mr. Gallegos, in order to allow the State to continue investigating and receive additional testing from crime labs. The forensic evidence needed and other investigation and preparation required to prosecute two aggravated murder charges against four defendants can reasonably be expected to require considerably more pretrial work than a typical prosecution.

Mr. Gallegos nonetheless argues that this factor should be weighed heavily against the State because of what he characterizes as gamesmanship on the part of the State over whether trial of the defendants would be severed. He can point to the trial court's unhappiness with the State for failing to candidly assess the need for severance between the December 2013 hearing and early 2014. Nonetheless, other developments in the case during that time frame either changed the complexion of the case or required resolution. They include the cooperation and plea agreements reached with Messrs. Whalen and Pineda; Mr. Villa's retention of an expert and assertion of a diminished capacity defense; the defendants' requests (including Mr. Gallegos's request) to make several motions that would be briefed and ready to be heard in late June 2014, at the earliest; and—prior to the time that Mr. Villa reached a plea agreement—a dispute between him and the State over whether his recorded statement must be produced to Mr. Gallegos.

22

While the trial court was clearly unhappy with the State's failure to comply with its request that the State prepare an early and candid assessment of whether and how the cases could be jointly tried, it was Mr. Gallegos whom the criminal rules required to make a motion to sever. It was always within his power to do so and thereby to force the State's hand. If any passage of time counts against the State for failing to comply with the trial court's request for a candid assessment of the severance issue, it weighs minimally against the State.

*Defendant's assertion of speedy trial right.* The third factor identified in *Barker* is whether the defendant asserted his speedy trial right. *Barker*, 407 U.S. at 528-29. Mr. Gallegos demanded a speedy trial and consistently objected to continuances.

The State contends the continuances were requested by Mr. Gallegos's counsel. But the trial court perceived defense counsel as joining in only the request for the first continuance, from April 1, 2013 to June 24, 2013. After Mr. Gallegos complained that his lawyer's agreement to the continuance presented a conflict of interest, Mr. Gallegos's lawyer did not join in any further continuance request.[3] Most continuances were either

---

[3] The State argues, incorrectly, that "On March 28, 2014, Gallegos informed the Court that the parties were in ongoing negotiations," citing "CP 182." Br. of Resp't at 29.

The cited record indicates that at the March 28 hearing the court asked whether there were ongoing negotiations. *The prosecutor* responded, "Both counsel have asked me to make offers." CP at 182. But Mr. Gallegos's lawyer disputed that negotiations were ongoing, and stated:

requested by the State or deemed necessary by the court, and the record shows over and over again that Mr. Gallegos personally, and through his counsel, contested the continuances. Mr. Gallegos's opposition to delay was consistent, and it was discussed and emphasized at nearly every hearing. This factor weighs against the State.

*Prejudice.* The last factor identified by *Barker* is prejudice to the defendant. "Prejudice is judged by looking at the effect on the interests protected by the right to a speedy trial: (1) to prevent harsh pretrial incarceration, (2) to minimize the defendant's anxiety and worry, and (3) to limit impairment to the defense." *Iniguez*, 167 Wn.2d at 295. Unless a defendant has been subjected to extreme delay (more than five years), the defendant must set forth particularized prejudice that would weigh heavily against the State. *Ollivier*, 178 Wn.2d at 842-44.

Here, the actual prejudice alleged by Mr. Gallegos is that delay enabled the State to fortify its case against him by persuading codefendants to testify as cooperating witnesses. But experience tells us that often, the impetus for agreement to cooperate is an

---

We're two weeks out for trial. We're over a year into it, and we've never had an offer. For the court to ask if negotiations are ongoing, there really haven't been. Nor do I think there will be meaningful negotiations with regard to Mr. Gallegos. I think the only offer that we will conceivably get is plead guilty to murder. I know that he's not going to take that.

Just to be frank with the court, I'm not real concerned with trying to have time to settle the case. I don't think it's going to happen. I think that all the issues that are outstanding should have been resolved by now.

CP at 191.

24

upcoming trial date, not the mere passage of time. Mr. Gallegos offers no evidence or argument why, if there had been an earlier firm trial date, his accomplices would not earlier have become cooperating witnesses. His suggestion that Messrs. Whalen, Pineda, and Villa would not have testified against him if the trial occurred earlier is not only speculative, but doubtful. This factor weighs in favor of the State.

On balance, the circumstances leading to roughly an 18-month delay in Mr. Gallegos's trial do not support a finding of a speedy trial violation of constitutional magnitude that would justify dismissal with prejudice of the charges against him.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds for review (SAG), Mr. Gallegos raises a number of alleged errors, some related, which we consolidate where appropriate.

*Prior conviction stipulation.*[4] Mr. Gallegos argues he received ineffective assistance of counsel when his trial lawyer suggested he sign a stipulation for the unlawful possession of a firearm charge. The record includes Mr. Gallegos's stipulation that "defendant has [a] prior conviction for a serious offense." CP at 405-06. Mr. Gallegos argues that by stipulating, he conceded his guilt on the homicide charge. He requests an evidentiary hearing in order to determine how much prejudice he suffered as

---

[4] SAG no. I, at 3.

25

a result of counsel's purportedly deficient performance.[5]

The stipulation signed by Mr. Gallegos conceded one element of the crime of possession of a firearm, but did not concede he had committed that crime, let alone that he had committed homicide. Where a prior conviction is an element of a charge and can be proved, it is a common defense practice to stipulate to the conviction, thereby avoiding presentation to the jury of more damaging details of the prior offense. Trial counsel's performance was not deficient.

*Accomplice instruction.*[6] Mr. Gallegos alleges the court's instruction to the jury regarding accomplice liability deprived him of his due process right to have every element of the offense established beyond a reasonable doubt. He argues that in combination with the complained-of stipulation on the firearm charge the instruction created prejudicial error.

As just explained, there was no stipulation to the firearm charge.

The instruction on accomplice liability, appearing at Clerk's Papers 1177 and based on WPIC 10.51, is an accurate statement of the law.

We see no way in which the stipulation, the jury instruction, or both in combination, can be contended to have deprived Mr. Gallegos of his due process right or

---

[5] SAG no. III, at 3; SAG no. VI, at 14.

[6] SAG no. II, at 4.

prejudiced him. Even where error is claimed in a SAG, we do not consider it if it is unsupported by argument or citation to legal authority. RAP 10.3(a)(6).

*Gang evidence.* Mr. Gallegos argues that the admission of gang evidence at his trial requires reversal. It was the State's theory that the motive for Mr. Pineda's threatened assault of Mr. Eby was that Mr. Eby solicited a member of a rival gang to rob Mr. Pineda, and, when Mr. Eby began beating Mr. Pineda, that Mr. Gallegos was motivated by gang allegiance to protect Mr. Pineda by shooting Mr. Eby. Just before the pretrial hearing held on August 20, 2014, Mr. Gallegos's lawyer conceded that gang evidence was admissible. Mr. Gallegos asserts his lawyer's concession impinged on Mr. Gallegos's decision making authority[7] and requests an evidentiary hearing in order to determine whether his trial lawyer was ineffective.[8]

To the extent Mr. Gallegos is alleging ineffective assistance by his trial lawyer[9] in conceding the admissibility of the evidence, the record reflects the concession was prompted in part by the lawyer's belief the evidence would be ruled admissible, but also by strategic self-interest:

> It's, you know, this, this is a case where you can't really separate the testimony without involving the gang evidence and, and it cuts both ways. There's portions of that are very helpful to us and, and, you know, interplay between, you know, Villa and Pineda and different things and the different, you know, things that happened not involving Mr. Gallegos.

---

[7] SAG no. V, at 11.

[8] SAG no. VI, at 14-17.

[9] SAG no. IV, at 8; SAG no. V, at 11.

RP at 98. Recall that Mr. Gallegos's lawyer elicited evidence that it was Mr. Villa, not

Mr. Gallegos, who had power in the La Raza gang. Additionally, the record reflects the

fact that Mr. Gallegos has conspicuous gang-related tattoos on his face. Even Mr.

Gallegos's SAG states, "Mr. Gallegos has tattoos allover [sic] his face and a mongol

haircut." SAG at 12. According to the record, he is proud of the tattoos and did not want

to attempt covering them during trial.

As a trial-tactic decision, conceding the admissibility of the gang evidence was

within the trial lawyer's authority. And Mr. Gallegos fails to demonstrate that the

concession was not legitimate trial strategy. He also fails to demonstrate that the court

would have excluded the evidence but for his lawyer's concession. He fails to

demonstrate either prong required to establish ineffective assistance of counsel.

*Alibi witness.* Mr. Gallegos makes references to having received ineffective

assistance of counsel because his trial lawyer did not interview certain witnesses.

Because the issue involves factual allegations outside the record of this appeal, his

remedy is to seek relief through a personal restraint petition. *State v. Norman,* 61 Wn.

App. 16, 27-28, 808 P.2d 1159 (1991).

Affirmed.

## PERSONAL RESTRAINT PETITION

Mr. Gallegos seeks relief from personal restraint imposed for his convictions at

28

issue in the direct appeal. As part of the judgment and sentence, the court imposed legal financial obligations (LFOs) totaling $13,514.15. They include $11,764.15 in restitution, a $500.00 crime penalty assessment (victim's penalty assessment), a $200.00 filing fee, $600.00 for court appointed counsel, a $100.00 DNA[10] collection fee, a $250.00 jury fee, and a $100.00 crime lab fee.

Citing *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015), Mr. Gallegos claims for the first time by collateral attack that the sentencing court unlawfully imposed the LFOs because it failed to consider his present or future ability to pay. Because he is alleging a nonconstitutional error, he must show that a fundamental defect in his sentence attributable to the LFOs has inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990).

In *Blazina*, the court held that RCW 10.01.160(3) requires the sentencing judge to engage in an individualized inquiry on the record into the defendant's current and future ability to pay before imposing discretionary LFOs. 182 Wn.2d at 837, 839. But RCW 10.01.160(3) does not apply to mandatory LFOs. *State v. Lundy*, 176 Wn. App. 96, 103, 308 P.3d 755 (2013). With the exception of the $600.00 court appointed attorney recoupment and the $250.00 jury demand fee[11], all of the LFOs imposed on Mr. Gallegos

---

[10] Deoxyribonucleic acid.

[11] The discretionary or mandatory character of the jury demand fee remains unclear. *See State v. Clark*, No. 32839-2-III, slip op. at 4 (Wash. Ct. App. Sept. 8, 2016), http://www.courts.wa.gov/opinions/pdf/328392_pub.pdf.

29

No. 32841-4-III (consol. w/ No. 34425-8-III)
*State v. Gallegos*

are mandatory. RCW 7.68.035; RCW 36.18.020(2)(h); RCW 43.43.7541; RCW 43.43.690(1).

With respect to the two discretionary LFOs, since Mr. Gallegos did not object to the trial court's finding that he had the present and future ability to pay, he has not preserved the asserted error for appeal. RAP 2.5(a). Because Mr. Gallegos's lifetime sentence without the possibility of parole means that the LFOs will never hinder his reentry into society, we decline to exercise our discretion to review his challenge to the trial court's failure to comply with RCW 10.01.160(3).

We dismiss the petition as frivolous under RAP 16.11(b) and RCW 10.73.140.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____    _____
Korsmo, J.                                  Fearing, C.J.

30